LEWIS DOMINIC SHAW,

        Plaintiff,

    v.

L. THOMAS, et al.,

        Defendants.

Case No. 17-cv-00462-YGR (PR)

**ORDER DENYING PLAINTIFF'S REQUEST FOR A CONTINUANCE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(D); AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This is a *pro se* civil rights complaint under 42 U.S.C. § 1983 filed by Plaintiff, a state prisoner currently incarcerated at Pelican Bay State Prison ("PBSP").  He alleges a claim of deliberate indifference to medical needs against PBSP employees stemming from inadequate treatment for a compound fracture and subsequent infection in his right thumb.  Dkt. 1 at 6, 8.[1]  He also claims that he was retaliated against for submitting a related inmate 602 appeal ("602 appeal").  *Id.* at 26-27.  He has named the following Defendants: PBSP Physicians N. Ikegbu, Dorfman, Adam, C. Sayre, Venes; PBSP Registered Nurses M. Hansen, B. Fellows, Alpaugh; PBSP Physician's Assistant L. Thomas; PBSP Family Nurse Practitioner Risenhoover; PBSP Chief Executive Officer D. Jacobsen; PBSP Chief Medical Officer M. McLean; and PBSP Correctional Officer C. George.  Plaintiff seeks injunctive relief as well as declaratory and monetary damages.

In an Order dated July 18, 2017, the Court screened Plaintiff's complaint and determined that he stated a cognizable Eighth Amendment claim relating to Defendants.  Dkt. 9 at 2-3.  The Court also found that Plaintiff had alleged a First Amendment retaliation claim against Defendant Thomas for a previous grievance Plaintiff filed against that Defendant.  *Id.* at 4.  The Court then directed the Clerk of the Court to serve the complaint and issued a briefing schedule for the served

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants to file a dispositive motion.  *See id.* at 4-8.

On December 26, 2017, Plaintiff filed a notice of voluntary dismissal without prejudice as to the claims against Defendants Dorfman and Hansen.  Dkt. 47.  In an Order dated April 23, 2018, the Court pointed out that the notice of voluntary dismissal without prejudice as to the claims against these Defendants was effective upon filing.  Dkt. 54 at 1 (citing Fed. R. Civ. P. 41(a)).  Thus, the Court directed the Clerk to update the docket to show that all claims against Defendants Dorfman and Hansen had been dismissed from this action.  *Id.*

The parties are presently before the Court on the dispositive motion filed by the remaining Defendants (hereinafter "Defendants").  Dkt. 52.  Defendants move for summary judgment: (1) on Plaintiff's Eighth Amendment claim against them on the ground that they did not violate his constitutional rights because he received proper care for his fractured thumb; (2) on his First Amendment claim against Defendant Thomas on the grounds that Plaintiff has failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), and even if he did exhaust the undisputed evidence shows Defendant Thomas did not retaliate against Plaintiff; (3) based on qualified immunity; and (4) on his claims for equitable relief because he is not entitled to injunctive relief because they are barred by the pending class action *Plata v. Brown*. *Id.*  Plaintiff has filed an opposition to Defendants' motion for summary judgment.  Dkts. 61, 61-1, 62.  Defendants have filed a reply to Plaintiff's opposition.  Dkt. 64.

Also on July 18, 2018, Plaintiff filed a request for a continuance under Rule 56(d)[2] of the Federal Rules of Civil Procedure, which involves a procedure by which a party may avoid summary judgment when such party has not had sufficient opportunity to discover affirmative evidence necessary to oppose the motion.  *See Garrett v. San Francisco*, 818 F. 2d 1515, 1518 (9th Cir. 1987).  In particular, Rule 56(d) provides that a court may deny a summary judgment motion and permit the opposing party to conduct discovery where it appears that the opposing party, in the absence of such discovery, is unable to present facts essential to opposing the motion.

---

[2] Plaintiff cites to Rule 56(f), the subsection in which the provisions pertaining to a party's inability to present facts essential to justify its opposition formerly were set forth; as of December 1, 2010, the applicable provision is Rule 56(d).  *See* Fed. R. Civ. P. 56.

*See* Fed. R. Civ. P. 56(d). Defendants oppose Plaintiff's request under Rule 56(d), as further explained below. Dkt. 65. Plaintiff has filed a reply to Defendants' opposition. Dkt. 67.

Having read and considered the papers submitted in connection with this matter, the Court hereby DENIES Plaintiff's request for a continuance pursuant to Rule 56(d) and GRANTS Defendants' motion for summary judgment.

## II.    PLAINTIFF'S REQUEST FOR A CONTINUANCE UNDER RULE 56(D)

As mentioned above, in his filing entitled, "Plaintiff's Notice of Opposition to Defendants' Summary Judgment Motion," Plaintiff makes a conclusory argument that the pending motion for summary judgment must be "denied or stayed for a[n] unspecified period of time, to be de[ter]mined by the Court, allowing more time for Plaintiff to complete his discovery." Dkt. 61 at 1. Defendants oppose the motion stating that Plaintiff "has had ample opportunities to conduct discovery and fails to show how any additional discovery would preclude summary judgment in favor of Defendants." Dkt. 65 at 1.

Specifically, Plaintiff states that his request for a continuance under Rule 56(d) was made on the grounds that:

> (1) Plaintiff has been diligently pursuing discovery[;]
>
> (2) Plaintiff has already began receiving discovery from two of the Defendants[;]
>
> (3) The objections Defendant[s] L. Thomas and B. Fellows asserted in their responses to Plaintiff's Request for Admissions, Interrogatories, and Production of Documents are meritless and an attempt to impede full and free discovery of the truth[;]
>
> (4) A number of Defendants in this matter are in possession of discovery Plaintiff is entitled to that will help him defeat their attemp[t] to have this suit dismissed on summary judgment;
>
> (5) This notice of motion;
>
> (6) The declaration of [Plaintiff] attached; and
>
> (7) Plaintiff's Memorandum of Points and Authorities.

Dkt. 61 at 1-2 (brackets added).

Rule 56(d) allows the Court to defer consideration of a motion where "a nonmovant shows

by affidavit or declaration that, for specified reasons, it cannot represent facts essential to justify its opposition." To obtain relief under Rule 56(d), "[t]he requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

Here, the record shows that Plaintiff filed a document entitled, "Declaration of Lewis Dominic Shaw in Opposition to Defendants' motion for summary judgment; pursuant to FED. R. C. P. Rule 56([d])." Dkt. 61 at 2-20 (brackets added). However, in this declaration, Plaintiff does not mention "the specific facts [he] hopes to elicit from further discovery" or explain how "the sought-after facts are essential to oppose summary judgment." *See Family Home & Fin. Ctr., Inc.*, 525 F.3d at 827. Thus, Plaintiff's declaration does not fulfill his obligation to file the required affidavit. *See id.* Instead, Plaintiff's aforementioned declaration contains arguments in support of his opposition to Defendants' motion for summary judgment. *See* Dkt. 61 at 3-20. As such, the Court finds that Plaintiff failed to file the required affidavit, a deficiency that itself justifies denying the instant Rule 56(d) request. In addition, as mentioned above, Plaintiff's declaration fails to describe the specific facts that would be revealed or why this discovery would preclude summary judgment. Moreover, Defendants argue that "Plaintiff cannot deny that he was given a copy of all the medical and hospital records related to this case and the incident in question," and they further state as follows:

> [Plaintiff] has propounded 64 requests for production of documents, 112 requests for admission, and 46 requests for interrogatories. Defendants have responded to all of his discovery requests, although Plaintiff now finds the responses inadequate. Defendants have also produced 515 documents in response to Plaintiff's discovery requests, and included all the relevant documentation in support of their motion for summary judgment.

Dkt. 65 at 2. Defendants also point out that Plaintiff has filed a lengthy opposition, stating as follows:

> In support of his opposition to Defendants' motion for summary judgment, Plaintiff has also filed a 20-page notice of opposition and declaration in support of opposition (ECF No. 61); a 34-page notice of opposition and memorandum of points and authorities (ECF No. 61-1), a 14-page response to Defendants' undisputed facts (ECF No. 62), and 257-pages of supporting exhibits—including medical

records and Defendants' discovery responses (ECF No. 63). Plaintiff was clearly able to prepare a lengthy opposition to the summary-judgment motion without needing additional discovery, and it is unclear why a stay is necessary at this point.

*Id.*

"Failure to comply with the requirements of Rule [56(d)] is a proper ground for denying discovery and proceeding to summary judgment." *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986). Therefore, Plaintiff's request for a continuance pursuant to Rule 56(d) is DENIED. Moreover, in his reply to the opposition, Plaintiff concedes that he "has made no request for discovery." Dkt. 67 at 3. Because the parties agree that no pending discovery matters need to be resolved, it then follows that any request to stay this matter for Plaintiff to complete discovery would have been unnecessary.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

One of the issues presented in Defendants' summary judgment motion is whether Plaintiff properly exhausted his administrative remedies as to his retaliation claim against Defendant Thomas. Before turning to the facts of this case, the Court briefly reviews the requirements of the PLRA and administrative review process applicable to California prisoners.

### A. Legal Framework for Exhaustion of Available Administrative Remedies

The PLRA requires a prisoner to exhaust all available administrative remedies before bringing an action with respect to prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion of all "available" remedies is mandatory; those remedies neither need to meet federal standards, nor must they be "plain, speedy, and effective." *Booth v. Churner*, 532 U.S. 731, 739-40 (2001). The PLRA requires *proper* exhaustion of administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Thus, compliance with prison grievance procedures is required by the PLRA to exhaust

properly.  *Id.*

The CDCR provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  Cal. Code Regs. tit. 15, § 3084.1(e).  Healthcare appeals are handled separately from grievances concerning the actions of custody staff.  Voong Decl. ¶ 2.

On January 28, 2011, certain revisions to the California prison regulations governing inmate grievances became operative.  *See* History, Note 11, Cal. Code Regs. tit. 15, § 3084.2.  In order to exhaust all available administrative remedies within this system, a prisoner must submit his complaint on CDCR Form 602 ("602 appeal") and proceed through three levels of appeal: (1) first formal level appeal filed with one of the institution's appeal coordinators, (2) second formal level appeal filed with the institution head or designee, and (3) third formal level appeal filed with the CDCR director or designee (i.e., "Director's level").  Cal. Code Regs. tit. 15, §§ 3084.1(b), 3084.7.  Under specific circumstances, the first level review may be bypassed.  *Id.*  The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies.  *Id.* § 3084.7(d)(3).  A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him.  *Butler v. Adams*, 397 F.3d 1181, 1183 (9th Cir. 2005); *Bennett v. King*, 293 F.3d 1096, 1098 (9th Cir. 2002).

The level of detail in an administrative grievance necessary to exhaust a claim properly is determined by the prison's applicable grievance procedures.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  The level of specificity required in the appeal is described in the California Code of Regulations as follows:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue.  To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.

Cal. Code Regs. tit. 15, § 3084.2(a)(3) (emphasis added).

### B. Factual Background[3]

#### 1. The Parties

At the time of the events set forth in his complaint, Plaintiff was a state prisoner who was incarcerated at PBSP. See Dkt. 1 at 1. Also during the time frame at issue, the following Defendants were employed by PBSP: Chief Medical Executive Jacobsen; former California Correctional Health Care Services ("CCHCS") Chief Executive Officer ("CEO") McLean; Physicians Adam, Espinoza, Ikegbu, Sayre and Venes; Registered Nurses ("RNs") Alpaugh, and Fellows; Family Nurse Practitioner ("FNP") Risenhoover; Physician's Assistant ("PA") Thomas; and Correctional Officer George.

#### 2. Plaintiff's Version

The following background relating to Plaintiff's Eighth Amendment claim is taken from the Court's July 18, 2017 Order:

> Plaintiff claims that on December 5, 2014, he was "targeted during a prison riot on B-Facility, and viciously attacked by several inmates." Dkt. 1 at 6. Soon thereafter, Plaintiff was "transported to an outside medical facility—Sutter Coast Hospital." *Id.* Plaintiff claims that Dr. Helmuth F. Vollger "re-set the fracture in plaintiff[']s thumb." *Id.*

> Plaintiff alleges that from December 6, 2014 through mid-April 2015, he suffered "unnecessary pain and suffering" in his fractured right thumb. *Id.* at 6, 7-8, 12, 15-16. His injured right thumb initially

---

[3] This Order contains many acronyms. Here, in one place, they are:

ASU          Administrative Segregation Unit
CDCR        California Department of Corrections and Rehabilitation
CEO          Chief Executive Officer
CME         Chief Medical Executive
CCHCS       California Correctional Health Care Services
FNP          Family Nurse Practitioner
HCARTS     Health Care Appeals and Risk Tracking System
HCCAB      Health Care Correspondence and Appeals Branch
IATS         Inmate Appeals Tracking System
ICAB         Inmate Correspondence and Appeals Branch
IUMC        Institutional Utilization Management Committee
OOA          Office of Appeals
PBSP         Pelican Bay State Prison
PA            Physician's Assistant
PCP          Primary Care Provider
RN            Registered Nurse
UHR         Unified Heath Record
UTA         Urgent Treatment Area

required re-setting as well as a spica splint[4] and, subsequently, Plaintiff had to take antibiotics to treat an infection. *Id.* Extensive physical therapy is now necessary in order to get the full range of motion in his thumb back. *Id.* The aforementioned allegations support an inference that Plaintiff has serious medical needs. Liberally construed, Plaintiff's allegations that PBSP medical staff failed to provide adequate medical treatment for the compound fracture in his right thumb and subsequent infection state cognizable Eighth Amendment claims of deliberate indifference to his serious medical needs against Defendants Hansen, George, Fellows, Risenhoover, Ikegbu, Dorfman, Adam, Thomas, Sayre, Venes, Alpaugh, Jacobsen, and Mclean. Specifically, Plaintiff claims he was denied the following requests: (1) to have his wound cleansed by Defendants Hansen, George, and Fellows; (2) to be treated in a timely manner with an effective course of antibiotics by Defendants Risenhoover, Ikegbu, Dorfman, Adam, Thomas, Sayre, Venes, and Alpaugh; (3) to be transported to a medical appointment, with or without having to remove his arm sling so that he could be double cuffed, by Defendants George and Fellows; (4) to have the blood work done (as ordered by Defendant Ikegbu) by Defendants George and Fellows; (5) to retain possession of the arm sling and spica splint as part of his ongoing medical treatment plan by Defendants Ikegbu, Thomas, Jacobsen, and Mclean; (6) to place back on the spica splint after x-rays showed his thumb was still in the infancy stages of healing by Defendants Thomas and Jacobsen; (7) to be provided effective follow-up care by Defendant Thomas and extensive physical therapy by Defendants Jacobsen and Thomas; and (8) to have his request for a surgical intervention taken seriously, if not otherwise granted, by Defendant Ikegbu. *See id.* at 6-16.

Dkt. 9 at 2-3 (footnote renumbered). In his complaint, Plaintiff also alleged a First Amendment retaliation claim against Defendant Thomas, stating as follows:

Plaintiff also claims that Defendant Thomas retaliated against him for submitting a 602 appeal "complaining of the many arbitrary and capri[ci]ous medical decisions [Defendant Thomas] had subjected [Plaintiff] to." *Id.* at 13-14; 26-27. Plaintiff claims that after he filed the aforementioned appeal against Defendant Thomas, Plaintiff had an appointment with Defendant Thomas on February 24, 2015. *Id.* at 14. Prior to turning her attention to Plaintiff, Defendant Thomas first told the prison guards who escorted him to the appointment that ". . . these guys wanting to come in here are just a bunch of whiners and complainers with little else to do than put in sick call slips and file 602s." *Id.* Defendant Thomas then told Plaintiff that his thumb "had healed fine, and she did not think he needed any physical therapy." *Id.* Plaintiff claims that he attempted to explain why he disagreed with her, but that she instructed the prison guards to take him back to his cell, thereby "discontinuing [his] health care appointment prematurely in retaliation for the submission" of his 602 appeal against her. *Id.* Plaintiff claims that as a "pretext to justifying

---

[4] According to the internet encyclopedia, Wikipedia, a "spica splint" is a type of orthopedic splint used to immobilize the thumb and/or wrist while allowing other digits freedom to move. *See* https://en.wikipedia.org/wiki/Spica_splint (last accessed on February 20, 2017).

8

denying [him] his medical treatment, [D]efendant Thomas knowingly lied by claiming [Plaintiff] had bec[o]me 'uncooperative, argumentative and loud.'" *Id.* at 14.

*Id.* at 4.

To elaborate on his version of the factual background, Plaintiff has submitted a sword declaration in which he outlines the following series of events explaining how Defendants were deliberately indifferent in their actions or failure to act in response to his thumb injury. *See* Pl. Decl.; Dkt. 61 at 3-20. The Court includes the following summary below outlining the relevant events, which pertain only to the alleged actions and/or failure to act by the named Defendants:

### a. December 5-14, 2014 - Initial Treatment of Thumb Injury

As mentioned, on December 5, 2014, Plaintiff injured his thumb during a "prison riot." Pl. Decl. ¶ 4. He claims that the "bone in [his] thumb was pat[e]ntly fractured and exposed." *Id.* Defendant Ikegbu was present at the prison's clinic when Plaintiff arrived with "blood, dirt, and other unknown properties from the ground attached to, and around [his] open thump fracture." *Id.* ¶ 5. Plaintiff claims that prior being sent to the Urgent Treatment Area ("UTA"), medical staff "poured a water-like substance on the exposed flesh and bone in [his] thumb, and applied a sterile dressing to [his] thumb." *Id.* Plaintiff was then taken to the UTA where Defendant Sayre ordered for Plaintiff to be transported via ambulance to Sutter Coast Hospital. *Id.* ¶ 7. Plaintiff claims that while he was waiting at UTA to be transported, no medical staff acted to "clean [his] thumb with normal saline." *Id.* Plaintiff was then transported to Sutter Coast Hospital where medical personnel (none of whom are named Defendants) treated his thumb injury by taking an x-ray of the thumb to reveal the fracture, numbing the thumb area, treating the wound with "a water-like substance, in addition with a reddish looking substance," stitching the wound closed, using an antibiotic dressing, and immobilizing it with a metal foam splint. *Id.*

After Plaintiff returned to PBSP from the hospital on December 5, 2014, Defendant Thomas ordered a prescription for Cephalexin, the generic antibiotic equivalent of Keflex, 500 mg four times a day for ten days, as well as both Ibuprofen and Tylenol #3 (Tylenol with codeine) for pain. Feinberg Decl. ¶ 31. However, Plaintiff claims that he did not receive the aforementioned medication until December 8, 2014. Pl. Decl. ¶ 14. Plaintiff also alleges that the dressing placed

by hospital staff on his thumb on December 5, 2008 was not replaced with clean dressing until December 9, 2014 when Defendant Venes "cleaned away the blood and infectious maladies that had been festering in and around the sight of my compound fracture since December 5, 2014 . . . ." *Id.* ¶ 17. Thus, Plaintiff claims by that time "an infection had already begun to take effect." *Id.* Finally, Plaintiff claims that the "temporary spica 'like' splint that [Defendant] Venes created to replace the metal foam thumb splint [Plaintiff] had been wearing was not sufficient enough to keep the set in my fractured thumb stabilized." *Id.* On December 12, 2014, Defendant Venes created a "new spica like splint," but Plaintiff claims that "it was not an adequate substitute capable of keeping [his] recently set fracture stabilized." *Id.* ¶ 19.

On December 14, 2014, Plaintiff was discharged from the UTA, and Defendant Ikegbu instructed him to "wear the arm sling she issued [him] whenever [he] was being escorted out of [his] cell, as well as when [he] wanted to walk around in [his] cell." *Id.* ¶ 24.

### b. December 15, 2014 - Defendant George's Refusal to Escort Plaintiff to Medical Appointment

Plaintiff claims that on December 15, 2014, he was "scheduled to receive nursing care which included having [his] thumb cleaned and dressing changed, as well as a blood draw." *Id.* ¶ 26; Ex. K; Dkt. 63 at 35-37. According to the attached discharge instructions dated December 14, 2014, prison medical personnel would "obtain CBC,[5] ESR,[6] CRP[7] [from Plaintiff] on 12/15/14." Dkt. 63 at 36.

Plaintiff claims that on December 15, 2014, Defendant George came to Plaintiff's cell and noticed that Plaintiff was wearing his arm sling. Pl. Decl. ¶ 27. Plaintiff claims that Defendant

---

[5] A complete blood count (CBC) is a test that measures the cells that make up your blood: red blood cells, white blood cells, and platelets. *See* https://www.webmd.com/a-to-z-guides/qa/what-is-a-complete-blood-count-cbc (last visited December 3, 2018).

[6] The erythrocyte sedimentation rate (ESR) reflects the degree of inflammation in the body. *See* https://www.webmd.com/osteoarthritis/qa/what-tests-are-used-to-determine-inflammation-for-rheumatoid-arthritis (last visited December 3, 2018).

[7] C-reactive protein (CRP) is a sign of inflammation, and a high CRP could mean someone has an inflammatory disease such as rheumatoid arthritis. *See* https://www.webmd.com/rheumatoid-arthritis/qa/what-is-a-creactive-protein-crp (last visited December 3, 2018).

George told Plaintiff that he had to check if there was a chrono[8] authorizing Plaintiff to be escorted with an arm inside and arm sling.  *Id.*  Defendant George returned with Defendant Fellows, who asked Plaintiff to sign "two CDCR 7225 medical refusal waivers," but Plaintiff refused to do so.  *Id.*  Instead, Plaintiff claims that he told Defendants George and Fellows that he would "take the arm sling off if that is what [he] had to do to be allowed to come out for [his] scheduled nursing care."  *Id.* ¶ 29.  However, Plaintiff claims that Defendants George and Fellows "persisted in their fabricated accusation that [he] refused to cuff up when [Defendant] George initially came to my cell door, insisting that because I did not come out then, [his] actions were deemed a medical refusal."  *Id.*  Plaintiff claims that Defendants George and Fellows "told [him] that no matter what [he] said to them, [he] was not coming out of [his] cell for any medical treatment that day."  *Id.*

### c.  December 16, 2014 - Rescinding of Arm Sling Chrono by Defendant Thomas

On December 16, 2014, Plaintiff had a follow-up appointment with Defendant Thomas, during which she rescinded Plaintiff's arm sling chrono because "she did not think that ASU officers should have to be required to go through the extra hassle imposed by [Plaintiff] having a[n] armsling, or placing [him] in cuffs everytime [he] ha[s] to be escorted out of [his] cell."  Pl. Decl. ¶ 32.  Plaintiff claims that Defendant Thomas "never stated she did not think the arm sling served a legitimate medical purpose . . . ."  *Id.*  Plaintiff also claims that Defendant Thomas "blatantly lied' in her progress notes about seeing Plaintiff "actively and passively moving the joints in [his] right thumb."  *Id.* ¶ 33.  Plaintiff claims that since his thumb injury, "it is impossible for [him] to tuck [his] thumb into a closed fist."  *Id.* ¶ 34.

### d.  December 20-30, 2014 - After Rescinding of Arm Sling Plaintiff Complained of Thumb Pain

On December 20, 2014, Plaintiff was examined by Defendant Fellows for his daily dressing change and wound cleansing, and he claims that, contrary to Defendant Fellows's progress notes, he complained of pain.  *Id.* ¶ 35.  Plaintiff claims that from December 20 through

---

[8] A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff.

30, "after the removal of the arm sling, [he] complained everyday about the increased pain [he] was experiencing in [his] right thumb." *Id.* But to no avail. *Id.* Plaintiff adds that the "Ibuprofen pain pills" failed to alleviate his pain. *Id.*

On December 30, 2014, Plaintiff was examined by Defendants Thomas and Fellows, and he complained that his right thumb "throbbed and ached, and that the pain and throbbing worsened as the day progressed." *Id.* ¶ 36.

### e. January 2015 - Defendant Thomas's Removal of Spica Splint

On January 2, 2015, Plaintiff learned that Defendant Thomas instructed Defendant Fellows to remove Plaintiff's spica splint. *Id.* ¶ 37. However, Plaintiff claims that the "7410 special accom[m]odation chrono, which [he] had, g[ave] [him] the authorization to wear a spica splint on [his] right thumb, was not set to expire until January 30, 2015." *Id.* During his January 2, 2015 appointment, Plaintiff refused to relinquish his spica splint even though Defendant Thomas "discontinued the 7410 accom[m]odation chrono on December 30, 2014." *Id.* ¶ 41. Defendant Fellows allowed Plaintiff to continue wearing his spica splint until he was able to speak with Defendant Thomas about it. *Id.*

On January 2, 2015, Plaintiff complained to Defendants Jacobsen and McLean to "put [them] on notice that [Defendant] Thomas['s] medical decisions regarding [his] medical needs showed a pattern of deliberate indifference . . . ." *Id.* ¶ 38. However, he did not receive a response for the aforementioned Defendants. *Id.* ¶ 40.

On January 9, 2015, Plaintiff's x-rays of his thumb were taken. *Id.* ¶ 42. After completion of the x-rays, Plaintiff's spica splint was "immediately tossed in the trash." *Id.* ¶ 43. Plaintiff claims that "[n]otwithstanding the fact [that] the x-ray slides revealed that [his] right thumb was still fractured, a 7410 chrono for a spica splint was not reissued. *Id.* ¶ 44. Plaintiff claims that from January 9, 2015 through April 2015 when he was released into general population, his right thumb was "repeated[ly] jammed and banged against the food slot." *Id.* ¶ 45. Plaintiff claims he was also "subjected to correctional officers maliciously pulling [his] thumb and causing [him] unnecessary pain and suffering." *Id.* Plaintiff claims that he submitted a 602 appeal, log no. PBSP HC 15028879, complaining about "the numerous arbitrary and capricious medical decisions

12

[Defendant] Thomas had subjected [him] to." *Id.* ¶ 46.

### f. February 11, 2015 - Follow-Up TeleMedicine Orthopedic Visit With Dr. Cross

As a result of the aforementioned 602 appeal, Defendant Jacobsen and the IUMC members "approved a follow-up Telemed Ortho visit with Dr. Cross." *Id.* ¶ 48. Dr. Cross ordered "repeat x-rays of [Plaintiff's] thumb," and "physical therapy two times a week for a month, until [Dr. Cross] had a chance to look over [Plaintiff's] latest x-rays." *Id.*

On February 11, 2015, Plaintiff had x-rays of his right thumb, which showed that the "fracture in his right thumb was still visible." *Id.*; Ex. W.

### g. February 24, 2015 - Appointment With Defendant Thomas and Limitation of Physical Therapy Sessions

Plaintiff claims that during his February 24, 2015 appointment with Defendant Thomas, she told him that "she thought [his] thumb had healed fine, and that she was not going to order any more physical therapy sessions for [him]." *Id.* ¶¶ 49, 51. Plaintiff attempted to "participate in [his] treatment plan by sharing what [he] had been told by the physical therapist and Dr. Cross," i.e., that he would need "extensive amount of hours with a physical therapist to get a reasonable range of motion in [his] right thumb," but Defendant Thomas accused him of lying and ordered the officers to take him back to his cell. *Id.* ¶¶ 51, 53. Plaintiff claims he "did not get loud, nor was [his] demeanor aggressive." *Id.* ¶ 52.

Plaintiff claims that Defendants Jacobsen and Thomas "only approved for [him] to have two physical therapy sessions." *Id.* ¶ 54. By April 12, 2015, Plaintiff "only received two physical therapy sessions, with each one only lasting thirty minutes." *Id.* Plaintiff claims that Defendant Fellows informed him that "the reason he wasn't being approved for any more physical therapy sessions was because they cost the state too much money." *Id.* ¶ 56.

### h. April 24, 2015 - Appointment With Defendant Ikegbu

On April 24, 2015. Plaintiff was examined by Defendant Ikegbu during which Plaintiff complained that he was "still experiencing pain and total stiffness in the distal proximal phalangeal base of [his] right thumb," that he "could not pick up items with [his] right thumb and index finger," and that he could not fully grasp items with [his] right hand." *Id.* ¶ 58. Defendant

Ikegbu acknowledged that she "reviewed the previous x-rays that had been taken of [Plaintiff's] right thumb." *Id.* ¶ 59.  Plaintiff claims that Defendant Ikegbu "even acknowledged that there was some swelling in [his] right thumb." *Id.*  However, Defendant Ikegbu "refused [Plaintiff's] request to work with a physical therapist."  *Id.*

### 3. Defendants' Version

#### a. Defendants' Involvement With Plaintiff's Thumb Care and Treatment

In their motion for summary judgment, Defendants have outlined each Defendant's involvement with Plaintiff's thumb care and treatment. *See* Dkt. 52 at 10-17.  The Court notes that Defendants have supported their motion for summary judgment with expert testimony. *See* Feinberg Decl.  Specifically, Defendants present a declaration from a medical expert, CCHCS Office of Legal Affairs Chief Medical Consultant Dr. Bennett Feinberg, who obtained his B.A. in molecular biology at University of California - Berkeley, obtained his medical degree at University of California - San Francisco, and now is a board-certified internal medicine physician. Dkt. 52-6 at 30.  In his position as Chief Medical Consultant, which he has held since February 2017, he "[p]rovide[s] expert review and analysis to CCHCS and [U.S. Department of Justice] attorneys for their response to court inquiries, lawsuits filed by patients, inquiries by patient advocates, medical board inquiries, and other matters involving claims regarding the medical condition of patients." *Id.*  Dr. Feinberg states that "[Plaintiff's] medical records documenting care provided to him while incarcerated in California prisons are maintained in what is called the UHR (unified health record), identified by his CDC# V71030." Feinberg Decl. ¶ 8, fn. 2.  He states that portions of these records have been provided to him by defense counsel, and that he also accessed Plaintiff's UHR from July 31, 2012 to present that are stored electronically, which was available to him as a practicing CCHCS physician. *Id.*  Lastly, Dr. Feinberg states that, "[a]lthough [he has] reviewed his entire record, [he] describe[d] only those portions pertinent to [his] opinion," and he certifies that the documents attached to his declaration are true and correct copies of original documents from Plaintiff's health record.  Feinberg Decl. ¶ 6, Ex. B at Shaw 001-100; Dkt. 52-6 at 32-137.  Thus, Defendants' outline is taken from Dr. Feinberg's summary of Plaintiff's medical records, and the Court includes the aforementioned outline as Defendants'

14

version of the factual background below.

**Doctor N. Adam.**

Defendant Dr. Adam is a physician and surgeon at PBSP. Dr. Adam participated in three Institutional Utilization Management Committees (IUMC) that met to evaluate Plaintiff's Primary Care Provider's (PCP) requests for specialty services, and that granted each request for services. ([Feinberg Decl.] ¶ 66-67.) According to medical records, Dr. Adam did not examine Plaintiff during the relevant time frame, but did examine him in May 2017 when Plaintiff complained about severe right shoulder and neck pain after doing pull-ups three to four weeks prior. (*Id.* ¶ 33.) On exam, she noted Plaintiff as being a "well-built male with hypertrophic muscles . . . . (*Id.*) She also noted that he was able to pull his shirts off overhead smoothly, using both arms equally. (*Id.*) She ordered pain medications and xrays. (*Id.*)

**Registered Nurse D. Alpaugh.**

Defendant Alpaugh's only relevant participation in this case was her documentation of the IUMC meetings and recommendations. (*Id.* ¶ 66-67.)

**Registered Nurse B. Fellows.**

When Plaintiff returned from the hospital, he did not see Defendant Fellows until December 8, 2014, when she responded to his request for "stronger pain medication." (*Id.* ¶ 13.) That day, noting Plaintiff was taking ibuprofen and antibiotics, she discussed Plaintiff's request with Dr. Venes and he ordered Tylenol #3 for his pain. (*Id.*; Ex. B: Shaw 021.) On December 9, 2014, she and Dr. Venes removed Plaintiff's old dressing, cleansed his skin, removed dried blood, and applied a new dressing and the temporary spica splint, molded to better fit his thumb. (*Id.* ¶ 14.) Before this date, there was no dressing change performed or ordered, and none would have been indicated at that time. (*Id.* ¶ 36.)

On December 15, 2014, Plaintiff was scheduled for unrelated lab work and a check of his vital signs. (*Id.* ¶ 21.) Fellows explained to Plaintiff that he could go without the sling to and from doctor's visits in order to cuff up, and if Plaintiff refused to be cuffed-up, that act qualified as a refusal of his healthcare services. (*Id.*) There is no evidence that Fellows dishonored an existing accommodation for a sling to deny Plaintiff treatment or care on December 15, 2014. (*Id.* ¶ 45.)

When Fellows attempted to get Plaintiff to sign the required refusal

15

forms, Plaintiff refused to sign, so Fellows noted his refusal on the forms. (*Id.* ¶ 44.) On January 2, 2015, Fellows attempted to enforce Thomas's order to discontinue Plaintiff's spica splint and replace it with an Ace wrap, but Plaintiff did not understand, so Fellows allowed him to retain the spica-splint wraps until Plaintiff could discuss it with Plaintiff's PCP the following week. (*Id.* ¶ 26.) On January 15, 2015, Fellows delivered medication to Plaintiff's cell front. (*Id.* ¶ 28.) On February 2, 2015, she interviewed Plaintiff for his appeal, Log No. HC 15028879, and noted that his request for an orthopedic follow-up had already been approved by the [Utilization Management] committee. (*Id.* ¶ 29.)

### Correctional Officer D. George.

Defendant George was assigned as a correctional officer in the Administrative Segregation Unit (ASU). Inmates housed in the ASU are required to be escorted throughout the institution in the most secured manner possible. George's only actions in this case took place on December 15, 2014, when he attempted to escort Plaintiff, housed in ASU, to his scheduled medical appointment for lab work and a check of vital signs. (*Id.* ¶ 43.) When George approached Plaintiff's cell, Plaintiff was not wearing the sling. (*Id.*) Because there was no chrono or evidence indicating that Plaintiff had any special medical needs that would qualify him for an exemption from being placed in restraints, George was not permitted to take Plaintiff to his appointment when Plaintiff refused to be restrained for the escort. (*Id.* ¶¶ 45, 56; M. Voong Decl. in Support of Defs.' Mot. Summ. J., Ex. A, Inmate Appeal, Log No. PBSP 14-03523.)

### Doctor N. Ikegbu.

Defendant Ikegbu was present when Plaintiff was initially brought in for his fractured thumb on December 5, 2014. (Feinberg Decl. ¶ 9.) She ordered the application a sterile dressing and urgent transport to the Urgent Treatment Area for further assessment and treatment, including IV antibiotics, wound exploration, possible debridement, reduction and fixation, immobilization and pain management. (*Id.*)

She saw Plaintiff again on December 13, 2014, when he was admitted to the Urgent Treatment Area (UTA) for further evaluation of his wound. (*Id.* ¶ 18.) On exam, Dr. Ikegbu noted that Plaintiff had no fever but appeared to be in pain, and his thumb was swollen and tender to the touch. (*Id.*) Dr. Ikegbu removed the sutures, placed eight days earlier, consistent with the recommendation for seven-to-ten-day suture removal. (*Id.*) To rule out any infection, Dr. Ikegbu's plan included a wound exploration, and the administration of intravenous antibiotics, which required temporary admission to the correctional treatment center (CTC) for a higher level of nursing care. (*Id.*) She then performed the wound exploration, with no

finding supporting a complicating infection, she applied sterile dressing, and replaced the spice splint held in place with ace bandages.  (*Id*.)  Dr. Ikegbu also provided a short course of intravenous antibiotics, broadening Plaintiff's oral antibiotic regimen, and ordered additional pain medications (Tylenol #3 and Ibuprofen).  (*Id*. ¶ 19.)  When Plaintiff was discharged the next day, Dr. Ikegbu issued orders to keep the dressing dry and intact for three days, and continued the prescribed pain medications, additional lab work, and provision of a temporary arm sling and spica splint.  (*Id*.)  Dr. Ikegbu also participated in three IUMCs that met to evaluate Plaintiff's PCP's requests for specialty services and that granted each request for services.  (*Id*. ¶¶ 66-67.)  She also ordered unrelated diagnostic tests in December 2014, January, and April, 2015.  (*Id*. ¶¶ 19, 21, 32.)  Dr. Ikegbu's final evaluation of Plaintiff occurred on April 22, 2015.  (*Id*. ¶ 32.)  While Plaintiff stated he had pain at the visit, Ikegbu noted he did not show signs of being in pain documenting he was "able to make a fist" and Plaintiff "states he is able to eat, write, clothe, and bathe himself, and do all other ADLs (Activities of Daily Living)."  (*Id*.)

### Doctor D. Jacobsen.

Defendant Jacobsen is the Chief Medical Executive (CME) at PBSP.  Dr. Jacobsen participated in three IUMCs that met to evaluate Plaintiff's PCP's requests for specialty services and that granted each request for services.  (*Id*. ¶¶ 66-67.)  Dr. Jacobsen also approved PA Thomas's discontinuation of the spica splint on December 31, 2014, approved Thomas's request to reschedule Plaintiff's x-ray to an earlier date, reviewed Plaintiff's x-ray results with Thomas on January 14, 2015, ordered additional x-rays for Dr. Cross on February 15, 2015 (completed the same day), and approved Thomas's request for two physical-therapy sessions on February 25, 2015.  (*Id*. ¶¶ 27,54-57, 63.)

Dr. Jacobsen was also the first-level reviewer on two of Plaintiff's health care appeals (PBSP HC 140[2]8835 & PBPS HC 15028879).  (*Id*. ¶¶ 54-56.)  She partially granted and partially denied his first health care appeal (PBSP HC 140[2]8835) on January 30, 2015, noting that Plaintiff's accommodation chrono was only for the temporary use of an arm sling, and medical staff could only recommend physical/movement limitations—the use of waist chains is a custody decision.  (*Id*. ¶ 55.)  On February 12, 2015, Dr. Jacobsen partially granted Plaintiff's second appeal (PBPS HC 15028879) and noted that there was nothing medically inappropriate about the discontinuation of the sling or the splint.  (*Id*. ¶ 56.)

### Chief Executive Officer M. McLean.

Defendant M. McLean was the Chief Executive Officer (CEO) for

17

the California Correctional Health Care Services (CCHCS) at PBSP. (McLean Decl. ¶ 1.) In this position, she reviewed health care appeals to determine if the inmate/patient's medical issue was adequately addressed, including determining whether the PCP addressed the issue, made a medical determination, and appropriately documented the basis of the decision. (*Id.* ¶ 3.) McLean's knowledge of Plaintiff's medical condition was limited to her second-level review of Plaintiff's health care appeals, PBSP HC 140[2]8835 & PBPS HC 15028879. (*Id.* ¶ 4.) McLean partially deni[ed] Plaintiff's first health care at the second level of review on March 9, 2015. (*Id.* ¶ 5, Ex. [B][9].) On April 9, 2015, McLean partially granted Plaintiff's second appeal, asking that his grievance be processed without delay. (*Id.* ¶ 6, Ex. [C][10].)

McLean did not provide Plaintiff with medical care and had no authority to provide him with appliances or accommodations that had been determined medically unnecessary by Plaintiff's Primary Care Provider. (*Id.* ¶ 3; Feinberg Decl. ¶ 55.) McLean's meaningful assessment of Plaintiff's treatment included a report on Dr. Cross's x-ray comparisons—noting evidence of healing of the fractured thumb joint, no change in alignment or position, and finding Plaintiff's thumb was going to heal with an acceptable alignment that did not required surgical intervention. (*Id.*)

**Family Nurse Practi[ti]oner S. Risenhoover.**

Defendant Risenhoover is a registered nurse and certified family nurse practitioner at PBSP, and her only relevant participation in this case was as a member of the three IUMCs that met to evaluate Plaintiff's PCP's requests for specialty services, wherein the committee granted each request for services. (*Id.* ¶¶ 66-67.)

**Doctor M. Sayre.**

Defendant Sayre was a physician and surgeon at PBSP. On December 5, 2014, Dr. Sayre ordered pain medication (Toradol), an IV drip, and transported Plaintiff via ambulance to Sutter Coast Hospital for a higher level of care. (*Id.* ¶ 10.) Dr. Sayre also participated in the three IUMCs that met to evaluate Plaintiff's PCP's requests for specialty services, wherein the committee granted each request for services. (*Id.* ¶¶ 66-67.)

---

[9] Defendants incorrected cited to Exhibit A, which is list of Plaintiff's appeals history, instead of Exhibit B, which includes the decisions pertaining to log no. PBSP HC 14028835. *Compare* McLean Decl., Ex A *with* Ex. B.

[10] Defendants incorrected cited to Exhibit B, which includes the decisions pertaining to log no. PBSP HC 14028835, instead of Exhibit C, which includes the decisions pertaining to log no. PBSP HC 15028879. *Compare* McLean Decl., Ex B *with* Ex. C.

18

**Physician's Assistant L. Thomas.**

Defendant Thomas is a Physician's Assistant [("PA")] at PBSP. Thomas actively participated in Plaintiff's care and treatment on six separate dates, and was a member of the three IUMCs that met to evaluate Plaintiff's PCP's requests for specialty services, wherein the committee granted each request for services. (*Id.* ¶¶ 12, 22, 26-27, 31, 66-67). Thomas also actively participated in Plaintiff's care and treatment on six days, described below.

When Plaintiff returned from the hospital, on December 5, 2014, PA Thomas documented a telephone note that Plaintiff "had wound cleansed and re-set with recommendation for follow-up next week." (*Id.* ¶ 12.) PA Thomas then gave verbal orders for Cephalexin, the generic antibiotic equivalent of Keflex, 500 mg four times a day for ten days, as well as both Ibuprofen and Tylenol #3 (Tylenol with codeine) for pain. PA Thomas also requested an order for an orthopedic consult. (*Id.* ¶ 31.) (*Id.*) [sic] According to Plaintiff's Medication Administration Record, Plaintiff received an initial supply of the Cephalexin on Friday, December 5, 2014, to last him over the weekend, with a remaining eight days dispensed on Monday, December 8, 2014. (*Id.*)

On December 16, 2014, PA Thomas's follow-up examination of Plaintiff noted that there was no muscle atrophy, and Plaintiff could actively and passively move the thumb joints. (*Id.* ¶ 22.) With no signs of infection, PA Thomas discontinued the arm sling because it was not medically necessary, continued the spica splint, redressed the wound, and wrote orders for nursing wound care and for every-other-day dressing changes. (*Id.*) Thomas noted that both staff and patient education were performed. (*Id.*) PA Thomas updated the 7410 form to include discontinuing the arm sling and her plan based upon that visit was to continue the spica splint through January 30, 2015. (*Id.*) The expectation was that Plaintiff would continue to heal well and no longer required narcotics for pain, so the Tylenol # 3 was allowed to expire on December 19, 2014. (*Id.*)

On December 30, 2014, PA Thomas reviewed the RN dressing change notes, as his last ordered dressing change had been completed that day. (*Id.* ¶ 26.) Thomas noted, "Per the RN the wound is closed and healing well." (*Id.*) Thomas was in the same exam room that day during the dressing change. (*Id.*) She noted that Plaintiff denied any pain and ordered the discontinuation of the dressing changes completely, removal of the thumb spica [splint], and ordered an Ace wrap only to support the thumb. (*Id.*) She also noted that the nurse can show Plaintiff how to wrap. (*Id.*) Plaintiff had a repeat x-ray ordered. (*Id.*) PA Thomas updated the 7410 form to remove the spica splint. (*Id.*)

On January 6, 2015, PA Thomas reviewed the chart including x-ray results from December and the prior ortho consult dated December 10, 2014. (*Id.*) Noting that Plaintiff did not relinquish the thumb spica splint, she documented it was to be removed per the previous order and replaced with an Ace wrap. (*Id.*) She also moved the next x-ray up to January 9, 2015. (*Id.*)

On January 14, 2015, Thomas reviewed Plaintiff's follow-up x-rays of the right thumb, which were performed on January 9, 2015, and compared with films taken about four weeks earlier, documenting her review and report with Dr. Jacobsen. (*Id.* ¶ 27.) Thomas also requested a repeat TeleMedicine[11] consult with Dr. Cross for further plan of care. (*Id.*)

On February 24, 2015, Plaintiff was seen by PA Thomas for a follow-up of his recent TeleMedicine Ortho visit and x-ray results. (*Id.* ¶ 31.) During this visit, Thomas read aloud to Plaintiff Dr. Cross's consult note from February 11, 2015, x-ray review and recommendations from February 19, 2015. (*Id.*) Dr. Cross's recommendation stated, "There is no change in alignment or position and in my opinion looks like this is going to go on to healing with an acceptable alignment that cannot be improved with surgical intervention." (*Id.*) PA Thomas noted "No close-up exam of thumb as visit cut short due to patient's demeanor. (*Id.*) Patient can actively and passively move the PIP thumb joint although somewhat stiff, seen from three feet across computer desk . . . . Visit cut short as patient had to be excused due to his loud, argumentative demeanor. (*Id.*) Sargent [sic] and two custody [officers] in exam room at time of patient's outburst and escorted out of cell. Patient stating, "man, this woman is just stupid." (*Id.*) PA Thomas documented requesting two physical therapy visits, but "no follow-up with Ortho ordered as there is no surgical intervention indicated." (*Id.*)

### Doctor D. Venes.

Defendant Venes was a physician and surgeon at PBSP until his retirement in December 2015. Dr. Venes was as a member of the three IUMCs that met to evaluate his PCP's requests for specialty services, wherein the committee granted each request for services. (*Id.* ¶¶ 66-67.) On December 8, 2014, Dr. Venes renewed Plaintiff's order for Tylenol #3. (*Id.* ¶ 13.) On December 9, Dr. Venes removed the old dressing on his wound, cleaned the wound, and

---

[11] The CCHCS maintains a "TeleMedicine Program" which coordinates with private health care entities to provide specialty care services using audio-visual technologies to California inmates.

applied a new dressing and the temporary spica splint, molded to better fit his thumb. (*Id.* ¶ 14.) During a follow-up exam on December 11, 2014, Dr. Venes complied with Plaintiff's request for additional days of narcotic analgesic, and after consulting with Dr. Cross on December 12, Dr. Venes created a spica splint and applied it to Plaintiff's thumb. (*Id.* ¶ 16.)

On December 23, 2014, Dr. Venes addressed Plaintiff's reported concern that the thumb felt "numb at times with tingling at the affected joint, especially after taking the ibuprofen in the evening,"—by noting in his chart that "Numbness and tingling are not unexpected sensations after relief of pain (with non-steroidal anti-inflammatory drug (NSAIDS)) because in a compound fracture some superficial nerves in the skin were likely disrupted, and may take many months to regrow." (*Id.* ¶ 23.) And after reviewing Dr. Cross's notes, Dr. Venes ordered a new x-ray for January 21, 2015. (*Id.* ¶ 24.)

Dkt. 52 at 10-17 (brackets and footnote added).

### b. IUMC Meetings and Recommendations

As shown above, Defendants refer to the "Utilization Management Committee," "UM Committee," "Institutional Utilization Committee," and the "IUMC" throughout their statement of facts, *see* Dkt. 52 at 10-17, which is a committee in which members (who are physicians) "review policy guidelines and discuss requests for specialty services," *see* Feinberg Decl. ¶ 66. It appears these names refer to the same committee established by Title 15 of the California Code of Regulations § 3352, which states in part as follows:

> (a) An [IUMC] shall be established within each facility. The committee shall meet as often as necessary to approve or disapprove requests for medical services otherwise excluded by these regulations, review and manage referrals for specialty medical services, review and manage institutional and community hospital bed usage, review other available utilization management data, and report requested utilization management data to the Headquarters Utilization Management (HUM) committee. Committee decisions concerning the approval or disapproval of requests for medical services shall be rendered within 21 calendar days of the request of the treating physician.

Cal. Code Regs. tit. 15, § 3352 (a).

During the relevant time in this case—December 2014 through April 2015—the IUMC met three times relating to Plaintiff's medical care—on December 16, 2014, January 21, 2015, and March 4, 2015. Feinberg Decl. ¶ 66. The members of the IUMC were Defendants

Risenhoover, Adam, Jacobsen, Ikegbu, Sayre, and Venes. *Id.* Defendant Alpaugh documented the IUMC meetings and recommendations. *Id.* During each of the three IUMC meetings, Plaintiff's treatments were evaluated and unanimously approved by the members of the committee. *Id.* ¶ 67. Specifically, the IUMC meetings and recommendations have been summarized by Dr. Feinberg as follows:

> On December 16, 2014, the IUMC met to review Plaintiff's Sutter Coast Hospital Emergency Room records and the orthopedic surgeon's evaluation of Plaintiff's thumb. ([Feinberg Decl., Ex. B at Shaw] 101-102[.]) All members of the committee approved the request for an additional orthopedic evaluation of Plaintiff's thumb. (*Id.*) The IUMC met a second time at the request of PA Thomas, on January 21, 2015, and the committee again unanimously approved an additional orthopedic evaluation. (*Id.* [at] 103-104.) At the third IUMC, on March 4, 2015, after further review of Plaintiff's x-ray, the orthopedic surgeon's determination that Plaintiff was not a surgical candidate, and noting Plaintiff was uncooperative with his PCP, the committee approved PA Thomas's request for Plaintiff to be evaluated by a physical therapist. (*Id.* [at] 105-106.) During each of the three IUMC meetings, Plaintiff's treatments were evaluated and approved by the members of the committee. (*Id.* [at] 101-106.)

*Id.*

### c. Plaintiff's 602 Appeals

As mentioned above, the State of California provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare." *See* Cal. Code Regs. tit. 15, § 3084.1(a). The Office of Appeals ("OOA") receives, reviews, and maintains non-healthcare inmate grievances accepted for a Third Level Review, which is the final review in CDCR's inmate grievance process. Voong Decl. ¶ 2. Before August 1, 2008, the Office of Appeals received, reviewed, and maintained all final-level reviews of inmate grievances. *Id.* Effective August 1, 2008, healthcare appeals involving inmate medical, dental, and mental healthcare issues have been processed by CCHCS. *Id.*

Upon receipt by the OOA, non-healthcare inmate grievances concerning the actions of custody staff are logged into a computer database known as the Inmate Appeals Tracking System ("IATS"). *Id.* ¶ 3. The IATS tracks inmate appeals that have been accepted by the OOA and adjudicated at the third level of review, as well as all appeals that were received and screened out,

and the reasons the appeals were screened out. *Id.*

Meanwhile, as mentioned above, healthcare appeals are handled separately from grievances concerning the actions of custody staff. *Id.* ¶ 2. The Health Care Correspondence and Appeals Branch ("HCCAB"), formerly the Inmate Correspondence and Appeals Branch ("ICAB"), is the section of the CCHCS that receives and maintains all healthcare appeals accepted for third-level review and renders decisions on such appeals. Gates Decl. ¶¶ 1-3. All levels of healthcare appeals are tracked through a computer database known as the Health Care Appeals and Risk Tracking System ("HCARTS"). *Id.* ¶ 4. This system tracks inmate healthcare appeals that are processed by the institutions at the first and second levels of review, as well as those processed by the ICAB and adjudicated at the third level. *Id.* HCARTS also tracks healthcare appeals that were received and ultimately rejected, and the reason for the rejection. *Id.* The HCARTS is kept as a regularly conducted activity, and the computer entries are made at or near the time of the occurrence by the employee who processes the healthcare appeal. *Id.*

Again, as explained above, in order to exhaust available administrative remedies within this system, a prisoner must proceed through three levels of appeal. *See* Cal. Code Regs. tit. 15, § 3084.5; *Barry v. Ratelle*, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997). If an inmate pursues his claims through the third-level review, the inmate has satisfied the administrative remedies exhaustion requirement under § 1997e(a). *See id.* at 1237-38.

According to OOA Chief M. Voong, OOA personnel searched Plaintiff's appeal file for "any third level inmate appeals properly submitted by [Plaintiff] . . . between December 5, 2014 and April 20, 2015, at [PBSP]." Voong Decl. ¶ 4. Meanwhile, HHCAB Chief S. Gates stated that he conducted a review of Plaintiff's health care appeal history for "any health care appeals/grievances originating from [PBSP] for the period of December 5, 2014 through January 31, 2017." Gates Decl. ¶¶ 8-9. That aforementioned reviews revealed that during the relevant time frames Plaintiff submitted one non-healthcare appeal, log no. PBSP A 1403523, *see* Voong Decl. ¶ 6, and two healthcare appeals/grievances, log nos. PBSP HC 14028835 and PBSP HC 15028879 (originally submitted as PBSP SC 15000714), Gates Decl. ¶ 9. The Court elaborates on these aforementioned relevant appeals/grievances below by including the following summary

provided by Defendants, as follows:

### [(1)] Plaintiff's First Appeal Log No. PBSP A 1403523

This non-health care appeal only dealt with Defendant Correctional Officer George's actions. (*Voong Decl. Ex. B.*) Here, Plaintiff requested that correctional staff honor his medical chrono because he claimed that medical staff had provided him with a chrono, instructing him to utilize his arm sling whenever leaving his cell. (*Id.*) Plaintiff asserted that Officer George denied him medical treatment because Plaintiff would not take off the sling so he could be placed in waist chains for his escort to a medical appointment. (*Id.*) Plaintiff's request to have his appeal processed without delay was granted but his requests for a special escort and monetary damages were denied at the first, second, and third levels of review. (*Id.*) The denials clearly stated that Plaintiff was housed in [the ASU], his escort required waist restraints, and they observed he had been successfully escorted in waist restraints with the cast currently on his thumb. (*Id.*) As Plaintiff refused to be restrained properly, he did not attend his medical appointment, and his request for officers to escort him with his arm sling on was denied. (*Id.*) Plaintiff['s] appeal was exhausted on June 15, 2015. (*Id.*)

### [(2)] Plaintiff's First Healthcare Appeal Log No. PBSP HC 140[2]8835

In log number PBSP HC 140[2]8835, Plaintiff alleged: 1) substandard medical care and a serious infection in or around his compound fracture because Dr. Ikegbu removed his sutures, and 2) Officer George and RN Fellows's refusal to honor his alleged accommodation for using an arm sling during an escort on December 15, 2014. (*Gates Decl. Ex. B.*) Plaintiff requested 1) his appeal be processed without delay, 2) that ASU officers on second watch honor the chrono that he wear his arm sling when being escorted in waist chains, and 3) he receive monetary compensation ($100,000). (*Id.*) The appeal was partially granted at the first level, noting that Plaintiff's appeal process had been carried out without delay. (*Id.*) The appeal was denied as to Plaintiff's chrono (CDCR 7410) for the temporary use of an arm sling during escorts because waist chains are a custody decision, and medical staff could only recommend physical/movement limitations. (*Id.*) Plaintiff's request for monetary compensation was also denied as beyond the scope of the appeals/grievances process. (*Id.*) Dissatisfied with the responses at the first and second levels of review, Plaintiff appealed this grievance to the third level of review, which was also denied on June 10, 2015. (*Id.*) The Director's level noted that Plaintiff's request concerning the use of waist chains was a custody issue and would not be addressed in that appeal. (*Id.*) Additionally, the Director's decision noted that Plaintiff was routinely evaluated and treated by the PCP, orthopedic specialist, and nursing staff for an open compound fracture of his right thumb, and there was no documentation to indicate that medical staff refused to honor a medical chrono for his right-arm sling or waist chains. (*Id.*)

**[(3)] Plaintiff's [Second] Healthcare Appeals, Log Nos. PBSP-SC 1500714 [Original] and PBSP HC 15028879 [Re-Submitted]**

Plaintiff's second health care appeal was originally logged as staff complaint, log number PBSP-SC 1500714, but resubmitted as PBSP HC 15028879, with identical requests and facts. (*Id.* Ex. C.) Plaintiff's appeal requested: 1) a bone specialist assessment of damage to thumb, 2) reconstruction surgery if needed, 3) claimed that Thomas was deliberately indifferent by discontinuing dressing changes and a spica splint against Dr. Cross's orders, 4) $100,000, and 5) consolidation of this matter with PBPS-A-14-03523. (*Id.*) On February 12, 2015, a first level response was issued, noting that Shaw was interviewed by RN Fellows on February 2, 2015. (*Id.*) The appeal was partially granted, noting that the Institutional Utilization Management Committee (IUMC) had approved a follow-up TeleMedicine Orthopedic visit, which was completed on February 11, 2015. (*Id.*) Shaw's other requests were denied because: 1) reconstructive surgery was not recommended by the orthopedic specialist, 2) the appeal was reviewed and evaluated by the Hiring Authority and the issues were not deemed to meet the staff complaint criteria, 3) there was no evidence to support his claim that health care staff were deliberately indifferent to his medical needs, 4) monetary compensation was beyond the scope of the appeals/grievances process, and 5) PBPS-A-14-03523 was a custody appeal and cannot therefore be combined with a health care appeal. (*Id.*) Dissatisfied with the first and second level responses, Plaintiff appealed to the third level of review, which was also denied on June 10, 2015. (*Id.*) The Director's level decision found no documentation to support Plaintiff's claim regarding substandard medical care and further concluded that Plaintiff was receiving all treatment deemed medically necessary. (*Id.*)

Dkt. 52 at 18-20 (brackets added).

## C. Discussion

### 1. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the

task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). The defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with defendants, however. *Id.* "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166.

A district court may consider only admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

In support of their motion for summary judgment, Defendants have submitted declarations from: OOA Chief Voong; Defendant McLean (former CEO for medical care at PBSP); HCCAB Chief Gates; and Chief Medical Consultant Dr. Feinberg. Dkts. 52-3, 52-4, 52-5, 52-6. As mentioned above, Dr. Feinberg certifies that the documents attached to his declaration are true and correct copies of original documents from Plaintiff's health record. Feinberg Decl. ¶ 6, Ex. B at Shaw 001-100; Dkt. 52-6 at 32-137. Also attached to Dr. Feinberg's declaration are the responses at all three levels of appeal to Plaintiff's healthcare appeal, log no. PBSP HC 15028879. Feinberg Decl. ¶ 60, Ex. C. Meanwhile, the same documents relating to log no. PBSP HC 15028879 are attached to Chief Gates's declaration, along with the responses at all three levels of appeal to Plaintiff's other healthcare appeal, log no. PBSP HC 14028835. Gates Decl. ¶¶ 12, 15, Exs. B-C. Chief Gates states that a review of the inmate health care appeals records in the HCARTS database

was conducted for Plaintiff and attached to his declaration is a copy of the HCARTS health care appeal history printout for Plaintiff. *Id.* ¶ 8, Ex. A. Chief Gates certifies that the aforementioned documents are true and correct copies of the original documents.[12] *See id.*; Gates Decl. ¶¶ 12, 15, Exs. B-C. Chief Voong states that he conducted a review of the OOA system files to locate any third level inmate appeals between December 5, 2014 and April 20, 2015 properly submitted by Plaintiff, and attached to his declaration is a true and accurate copy of the IATS Printout for Plaintiff. Voong Decl. ¶¶ 4-5, Ex. A. Also attached to his declaration is a true and correct copy of the responses at all three levels of appeal to Plaintiff's other non-healthcare appeal, log no. PBSP A 1403523. *Id.* ¶ 6, Ex. B. Because the aforementioned documents have been properly authenticated pursuant to Federal Rule of Evidence 803(6), the Court will consider these documents in connection with Defendants' motion for summary judgment.

Plaintiff has verified his complaint and declaration[13] in support of his opposition by signing them under penalty of perjury. Dkt. 1 at 1-30; Dkt. 61 at 3-20. However, Plaintiff has not verified his opposition or his "Response to Defendants' Statement of Undisputed Material Facts In Support of Summary Judgment" because he failed to sign either under penalty of perjury. *See* Dkts. 61-1, 62. The Court may treat the allegations in the verified complaint and declaration as opposing affidavits to the extent such allegations are based on Plaintiff's personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating a plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, he stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but

---

[12] Defendant McLean, who conducted the second level review of Plaintiff's healthcare appeals, has attached the same exact documents as Chief Gates. McLean Decl. ¶¶ 5-6, Exs. A-C.

[13] Defendants have filed a separate objection to Plaintiff's declaration supporting his opposition based on several grounds, including that "affidavits like Plaintiff's that set forth ultimate facts and conclusions of law based upon hearsay and conclusory, self-serving, unsubstantiated or irrelevant allegations, cannot defeat a motion for summary judgment." Dkt. 64 at 8. The Court notes Defendants' objection and stresses that it only considers Plaintiff's allegations in his declaration to the extent such allegations are based on his personal knowledge and set forth specific facts admissible in evidence. *See Schroeder*, 55 F.3d at 460 & nn.10-11. Further, the Court may, in this Order, refer to Plaintiff's verified declaration in support of his opposition as his "declaration/opposition" or cite to it as "Pl. Decl."

United States District Court
Northern District of California

on his personal knowledge). Also attached to Plaintiff's complaint and opposition are medical records and appeal responses that are mostly similar to those attached to the declarations of Chief Voong, Chief Gates, and Dr. Feinberg. *See* Dkt. 63. As these documents are evidence already considered in connection with the summary judgment motion, the Court will also consider the same documents submitted by Plaintiff.

### 2. Analysis

#### a. Retaliation Claim Against Defendant Thomas

Plaintiff claims that Defendant Thomas's actions of discontinuing his February 24, 2015 medical follow-up were retaliatory because Plaintiff filed an administrative grievance against her. Dkt. 1 at 14, 26. Defendants claim that the prison has no record of this First Amendment claim showing that it has been exhausted at the final level of review. Dkt. 52 at 26. Defendants argue that Plaintiff's claim remains unexhausted because he never submitted it to, nor received a substantive decision by the final level of review as required by prison regulations. *Id.* Therefore, Defendants argue that they are entitled to summary judgment based on Plaintiff's failure to exhaust his administrative remedies. *Id.*

In support of Defendants' argument that Plaintiff's First Amendment claim is unexhausted, Defendants submit evidence that the non-healthcare appeal submitted by Plaintiff does not grieve the First Amendment claim against Defendant Thomas. Specifically, during the time frame at issue, Plaintiff submitted one non-healthcare appeal to the OOA that was accepted by and received a decision from the OOA—log no. PBSP A 1403523. Voong Decl. ¶¶ 6-7; Exs. A, B. Also during the relevant time frame, Plaintiff submitted two healthcare appeals/grievances, log nos. PBSP HC 14028835 and PBSP HC 15028879 (originally PBSP SC 15000714). Gates Decl. ¶ 9. But Defendants argue that none of these appeals concerned allegations relating to Plaintiff's claim that Defendant Thomas allegedly retaliated against him for filing grievances. *See* Dkt. 52 at 26; *see also* Voong Decl. ¶¶ 5-7, Exs. A-B; Gates Decl. ¶¶ 9-17, Exs. A-C.

The Court has reviewed the aforementioned appeals—log nos. PBSP A 1403523, PBSP HC 14028835, PBSP HC 15028879—and agrees with Defendants' assessment that Plaintiff failed to mention anything about Defendant Thomas's allegedly retaliatory conduct. *See id.* Nowhere

United States District Court
Northern District of California

does the Director's level reviewer in any of the aforementioned appeals handle Plaintiff's retaliation claim against Defendant Thomas. *Id.* A grievant must utilize all steps of the grievance process made available by the prison so that it can reach the merits of the complaint. *Woodford*, 548 U.S. at 90. Here, the record shows that Plaintiff failed to exhaust his administrative remedies as to his retaliation claim against Defendant Thomas. *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (no exhaustion where grievance complaining of upper bunk assignment failed to allege, as the complaint had, that nurse had ordered lower bunk but officials disregarded that order).

Meanwhile, in his sworn declaration, Plaintiff argues that he "did not fail to exhaust [his] first amendment retaliation claim against [Defendant] Thomas." Dkt. 61; Pl. Decl. ¶ 47. Plaintiff points out that in one of his healthcare appeals, log no. PBSP HC 15028879, he presented the claim that "the numerous and capricious medical decisions regarding [Plaintiff's] healthcare treatment were vindictive, unprofessional, and illustrate a showing [of] deliberate indifference." *Id.* He further points out that when he submitted his appeal to the third level of review after being dissatisfied with the conclusions reached at the second level of review, he stated as follows: "For all the reason[s] listed herein, [b]ut not limited to, every allegation and complaint that I have raised throughout the appeals process is being re-stated here." *Id.*

The healthcare appeal that Plaintiff seems to be relying on, log no. PBSP HC 15028879, was submitted on January 12, 2015. Gates Decl. ¶ 13. It was originally logged as a staff complaint, log no. PBSP SC 1500714, but it was resubmitted as a healthcare appeal, log no. PBSP HC 15028879, with identical requests and facts. *Id.* In this healthcare appeal, Plaintiff stated that the purpose of his appeal was "poor medical treatment and negligence," and he requested: 1) a bone specialist to assess the permanent damage to his thumb; 2) reconstruction surgery if needed; 3) monetary compensation in the amount of $100,000 for the "pain [he has] been made to suffer due to [Defendant] Thomas['s] negligence and deliberate indifference to [his] treatment needs; (4) consolidation of this matter with his other non-healthcare appeal, log no. PBSP-A-14-03523. *Id.*, Ex. B; Dkt. 52-5 at 26-27. On February 12, 2015, at the first level of review, the reviewer determined that it was a healthcare appeal and it could not be combined with log no. PBSP-A-14-

29

03523 because log no. PBSP-A-14-03523[14] was a "custody [or non-healthcare] appeal." Gates Decl., Ex. B; Dkt. 52-5 at 29. In addition, "the appeal was reviewed and evaluated by the Hiring Authority and the issues were deemed not to meet the Staff Complaint criteria." *Id.* Furthermore, the reviewer found "no evidence to support [Plaintiff's] claim that health care staff [was] being deliberately indifferent to [his] medical needs." *Id.* The reviewer "partially granted" the appeal because the IUMC "approved a follow-up TeleMedicine Orthopedic visit which was completed on February 11, 2015," and "Dr. Cross requested an X-ray of [Plaintiff's] right thumb, which was completed the same day." *Id.* Finally, Plaintiff's requests for reconstructive surgery and monetary compensation were denied. *Id.*

As the Court has found above, the record does not show that there were any retaliation claims or allegations of retaliation against Defendant Thomas in log no. PBSP HC 15028879. Gates Decl., Ex. B. Moreover, even if Plaintiff claims in a conclusory fashion that he raised such a claim in the upper levels of review, a new claim not previously presented at the first level of appeal is improper. *See* Cal Code Regs., tit. 15 § 3084.6(b)(16) (An appeal may be rejected if "[t]he appeal issue or complaint emphasis has been changed at some point in the process to the extent that the issue is entirely new, and the required lower levels of review and assessment have thereby been circumvented.") Thus, the Court finds that Plaintiff's reliance on vague statements made after the appeal was filed (in response to his dissatisfaction of the second level of review) are not sufficient to show that his retaliation claim was exhausted.

The Court further notes that even if Plaintiff had raised his retaliation claim as an additional *issue* in log no. PBSP HC 15028879, such a retaliation claim would have been likely screened out as a separate issue from his claim relating to alleged "poor medical treatment." According to state regulations, each inmate appeal is limited to one issue or related set of issues. Cal. Code Regs. tit. 15, § 3084.2(a)(1). "The inmate . . . shall not combine unrelated issues on a single appeal form for the purpose of circumventing appeal filing requirements. Filings of appeals combining unrelated issues shall be rejected and returned to the appellant by the appeals

---

[14] As explained above, log no. PBSP A 1403523 concerned a grievance against Defendant George for allegedly denying Plaintiff medical treatment. Voong Decl. ¶ 6; Ex. B.

coordinator with an explanation that the issues are deemed unrelated and may only be submitted separately." *Id.* Nevertheless, the Court notes that the prison did not even acknowledge that such an issue was brought up log no. PBSP HC 15028879; therefore, there were no issues to screen out. *See* Gates Decl., Ex. B.

In sum, Defendants met their initial burden as the moving party by setting forth evidence to demonstrate Plaintiff's non-exhaustion, specifically by conducting a search of the CDCR's records and finding no grievances submitted to the Director's level by Plaintiff concerning his retaliation claim. *See Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015). Defendants, relying on declarations of OOA Chief Voong and HCCAB Chief Gates, argue that none of the appeals Plaintiff submitted at the third level of review (during the relevant time frame) claim that Defendant Thomas retaliated against Plaintiff for filing grievances. *See* Voong Decl. ¶¶ 6-7; Gates Decl. ¶ 17. Under *Albino*, Defendants have therefore proven that there was an available administrative remedy and that Plaintiff did not exhaust that available remedy. *See Paramo*, 775 F.3d at 1191.

Upon the burden shifting to Plaintiff, in regards to his retaliation claim, he has failed to show that "there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Id.* As mentioned above, Plaintiff merely relies on log no. PBSP HC 15028879 as proof of exhaustion, but his reliance is unwarranted because the retaliation issue was not presented in that appeal. Thus, the aforementioned evidence presented by Plaintiff is insufficient to defeat Defendants' motion for summary judgment as to his retaliation claim. Meanwhile, the evidence produced by the Defendants *is sufficient* to carry their ultimate burden of proof in light of Plaintiff's verified factual allegations.

The record in this case demonstrates that Plaintiff had the opportunity and ability to properly exhaust the aforementioned retaliation claim but failed to do so. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to the retaliation claim against Defendant

Thomas, which is subject to dismissal without prejudice.[15]  *See McKinney v. Carey*, 311 F.3d 1198, 1200-01 (9th Cir. 2002) (proper course in claims dismissed due to failure to exhaust administrative remedies is dismissal without prejudice to refiling).

### b.  Deliberate Indifference to Medical Needs Claim

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983.  *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs."  *Estelle*, 429 U.S. at 104. "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104.  A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain."  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.  *McGuckin*, 974 F.2d at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

---

[15] The Court's decision to grant Defendants' motion for summary judgment as to the retaliation claim against Defendant Thomas on the grounds that it is unexhausted obviates the need to consider any of their alternative arguments as to this claim.

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [the plaintiff's] health." *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*

Here, as mentioned above, Plaintiff alleges that from December 6, 2014 through mid-April 2015, he suffered "unnecessary pain and suffering" in his fractured right thumb due to Defendants' failure to properly treat it. Dkt. 1 at 6, 7-8, 12, 15-16. Plaintiff claims that his injured right thumb initially required re-setting as well as a spica splint and, subsequently, he had to take because his thumb became infected. *Id.* Finally, he alleges that extensive physical therapy is now necessary in order to get the full range of motion in his thumb back. *Id.* Thus, Plaintiff claims that Defendants failed to provide adequate medical treatment for the compound fracture in his right thumb and subsequent infection. Dkt. 1 at 6-16. Specifically, Plaintiff claims he was denied the following requests: (1) to have his wound cleansed by Defendants Hansen, George, and Fellows; (2) to be treated in a timely manner with an effective course of antibiotics by Defendants Risenhoover, Ikegbu, Dorfman, Adam, Thomas, Sayre, Venes, and Alpaugh; (3) to be transported to a medical appointment, with or without having to remove his arm sling so that he could be double cuffed, by Defendants George and Fellows; (4) to have the blood work done (as ordered by Defendant Ikegbu) by Defendants George and Fellows; (5) to retain possession of the arm sling and spica splint as part of his ongoing medical treatment plan by Defendants Ikegbu, Thomas, Jacobsen, and Mclean; (6) to place back on the spica splint after x-rays showed his thumb was still in the infancy stages of healing by Defendants Thomas and Jacobsen; (7) to be provided effective follow-up care by Defendant Thomas and extensive physical therapy by Defendants Jacobsen and

Thomas; and (8) to have his request for a surgical intervention taken seriously, if not otherwise granted, by Defendant Ikegbu.  *See id.*

While Defendants seem to concede that, as alleged, Plaintiff's injuries to his thumb may rise to the level of a serious medical need, they argue that no evidence exists to show that Defendants acted with "deliberate indifference" to that need.  Dkt. 52 at 21-25.  Defendants argue that Plaintiff cannot establish that any Defendant was deliberately indifferent to his serious medical needs because, for those Defendants who treated and evaluated Plaintiff or reviewed his PCP's recommendations and orders, the evidence shows that their decisions were properly based on their evaluation and treatment of Plaintiff, his medical records and diagnostic tests, and applicable prison healthcare guidelines.  *Id.* at 22 (citing Feinberg Decl. ¶ 68).  Specifically, Defendants argue that the "undisputed admissible evidence shows" as follows:

> 1) Plaintiff received appropriate antibiotics and pain medications; 2) there is no evidence of Plaintiff's thumb being infected; 3) the discontinuation of Plaintiff's arm-sling and spica splint were medically justifiable and there is no evidence Plaintiff suffered any additional injury as a result of their discontinuations; 4) Defendants were not deliberately indifferent to his medical needs on December 15, 2014 when Plaintiff refused to cuff-up for his escort to medical; 5) Defendant PA Thomas was not deliberately indifferent or retaliatory in her actions on February 24, 2015; and 6) it was not medically necessary for Plaintiff to obtain further specialty evaluations, reconstructive surgery on his thumb, or hundreds of hours of physical therapy because his thumb injury had healed with an appropriate and acceptable alignment.

*Id.*

As mentioned above, a prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  *Farmer*, 511 U.S. at 837.  In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm.  *McGuckin*, 974 F.2d at 1060.  Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care.  *See id.* at 1062.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that Defendants were negligent in providing treatment, his allegations do not support an Eighth

Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Despite Plaintiff's claim that Defendants failed to provide adequate medical treatment for the compound fracture in his right thumb and subsequent infection, Defendants have submitted a verified declaration from their medical expert, Dr. Feinberg, indicating that Plaintiff's conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers. *See* Feinberg Decl. ¶¶ 5-67.

The Court will now analyze each stage of the treatment of Plaintiff's thumb injury, beginning with claims against Defendants who provided the initial treatment immediately after his thumb injury and ending with the claims related to the IUMC, which reviewed the requests for services pertaining to Plaintiff's medical care. At each stage, the Court will determine whether or not a reasonable trier of fact could find that Defendants' decisions were "'medically unacceptable under the circumstances'" and done "'in conscious disregard of an excessive risk to [Plaintiff's] health.'" *Toguchi*, 391 F.3d at 1058.

Defendants argue that the medical records show that they acted in accordance with their professional duties to prescribe timely and appropriate antibiotics, as well as wound care and dressing changes. Dkt. 52 at 22-23; Feinberg Decl. ¶¶ 38, 41. Defendants further argue that, contrary to Plaintiff's allegations, there is no medical evidence that his thumb was infected. *Id.* ¶ 42. Defendants have relied on their medical expert, Dr. Feinberg, who opined that it was a testament to the coordinated and effective healthcare Plaintiff received in the often unhygienic environment of a prison that an infection was successfully prevented. *Id.* Soon after the incident occurred, Plaintiff was sent to an outside hospital, and his wound was properly cleaned by the emergency room personnel. *Id.* ¶ 37. Following surgery, the splint and sterile dressing could not

be removed and had to be kept dry for several days to protect the incision and the surgical reconstruction. *Id.* Moreover, Defendants point out that nurses cannot perform wound care without orders from a physician to do so. *Id.* ¶ 42. Defendants argue that there is extensive nursing documentation of wound care once physician's orders were issued. *Id.* They add that all of Plaintiff's thumb x-rays after Defendant Ikegbu's wound exploration were noted by the radiologists to show alignment unchanged when compared with prior post-reduction films, and to show acceptable alignment per Orthopedic Specialist Dr. Cross. *Id.* ¶ 41.

In this case, the Court has outlined both Plaintiff's and Defendants' versions of the facts above. Viewing the evidence in the light most favorable to Plaintiff, the Court finds no genuine dispute exists as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendants, as explained below.

### 1) Claims Relating to Initial Treatment of Thumb Injury

Defendant Ikegbu, who was the first medical provider Plaintiff saw at the clinic immediately following his injury on December 5, 2014, ordered the application a sterile dressing and urgent transport to the UTA for further assessment and treatment. Pl. Decl. ¶ 7. While Plaintiff claims that medical staff did not clean his thumb with "normal saline," he acknowledges that medical staff "poured a water-like substance on the exposed flesh and bone in [his] thumb" prior to dressing it. *Id.* ¶ 5. Meanwhile, Plaintiff does not dispute that he was immediately rushed to UTA and then Sutter Coast Hospital (as ordered by Defendant Sayre) to treat his injured thumb. *Id.* ¶ 7. Thus, no reasonable trier of fact could find that Defendants Ikegbu and Sayre acted with deliberate indifference to Plaintiff's medical needs during their initial encounter after Plaintiff's thumb injury.

After Plaintiff returned to PBSP from the hospital on December 5, 2014, Plaintiff claims that Defendants Thomas's and Fellows' actions or failure to act led to a three-day delay in receiving his antibiotics and pain medication and a four-day delay in having his dressing replaced. Pl. Decl. ¶¶ 14, 17. As a result, Plaintiff claims his thumb became infected. *Id.* ¶ 17. Plaintiff also claims that the temporary "spica 'like' splint" that [Defendant] Venes created to replace the metal foam thumb splint "was not sufficient enough to keep the set in my fractured thumb

36

stabilized." *Id.* First, as mentioned above, Plaintiff seems to take issue with the fact that medical personnel did not clean the "filth on [his] right hand and near the si[te] of [his] compound fracture." *Id.* ¶ 10. However, even if Defendants Thomas and Fellows delayed giving Plaintiff his medication and failed to clean the "filth" around his wound and even if Defendant Venes's temporary splint was "not sufficient," such claims amount only to negligence in providing treatment and does not support a claim of deliberate indifference. *See Farmer*, 511 U.S. at 835. Negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. *See id.* Furthermore, even if Plaintiff suffered an infection as a result of the failure to clean the area around his wound, his medical records indicate that his complaints were not unheeded by Defendants, who continued to give him follow-up care according to his medical needs by giving him antibiotics and eventually cleaning the "filth" and covering his would with clean dressing. The medical records also show that on December 9, 2014, Defendant Venes attempted to create the temporary spica splint to better fit his thumb, and that three days later, on December 12, 2014, Dr. Venes created a spica splint and applied it to Plaintiff's thumb. Feinberg Decl. ¶¶ 14, 16. Even though Plaintiff takes issue with the inadequacy of the new spica splint, *see* Pl. Decl. ¶ 19, Plaintiff's difference of opinion with respect to treatment, without more, is not sufficient to state a § 1983 claim, *see Franklin*, 662 F.2d at 1344. Therefore, the Court finds that no reasonable jury could conclude that Defendants Thomas, Fellows and Venes were deliberately indifferent because while their actions delayed treatment (amounting to negligence), they did not *deny* treatment of Plaintiff's serious medical needs. *Cf. Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (summary judgment reversed where medical staff and doctor knew of head injury, disregarded evidence of complications to which they had been specifically alerted and, without examination, prescribed contraindicated sedatives).

### 2) Claim Relating to Refusal to Transport Plaintiff to December 15, 2014 Medical Appointment Due to Failure to Remove Arm Sling

Plaintiff claims that Defendants George and Fellows acted with deliberate indifference by denying him the opportunity to be transported to a December 15, 2014 medical appointment because they would not escort him without his arm sling. Pl. Decl. ¶¶ 27-29. As a result, Plaintiff

37

could not have certain blood work done on December 15, 2014, as ordered by Defendant Ikegbu. *Id.*, Ex. K; Dkt. 63 at 36. It seems that Plaintiff initially claimed that the December 15, 2014 was an appointment related to his thumb. *See* Pl. Decl. ¶ 26. However, according to the December 14, 2014 discharge instructions, he was scheduled only for a blood draw on December 15, 2014. *Id.*, Ex. K; Dkt. 63 at 36; Feinberg Decl. ¶ 43; Ex. B at Shaw 047.

Defendants argue that Defendant George's reaction of refusing to transport Plaintiff on December 15, 2014—after Plaintiff allegedly insisted that he could not be escorted without his arm sling—was not a denial of medical treatment or care. Dkt. 52 at 23 (citing Feinberg Decl. ¶¶ 43-45). Defendants point out that according to the chrono issued by Defendant Ikegbu, she did not intend for Plaintiff to wear the arm sling at all times because the chrono also included a requirement for Plaintiff to have "increased cuffing distance between his hands and behind his back, which is incompatible with wearing a sling during escorts." *Id.* at 23 (citing Feinberg Decl. ¶ 44; Ex. B at Shaw 050). Defendants further argue that no evidence exists showing that Plaintiff needed to be in a sling during the escort to his scheduled treatments. *Id.* Moreover, Defendants clarify that Plaintiff's allegation that Defendants George and Fellows were deliberately indifferent on December 15, 2014 was based on Plaintiff's misbelief that the appointment was for a wound cleaning and dressing change, "but in fact, the follow-up appointment was for unrelated lab work and a check of his vital signs." *See* Feinberg Decl. ¶ 43. Defendants argue that "Defendant George was not deliberately indifferent when he informed Plaintiff, who was housed in the ASU, that he would not be escorted unless he agreed to remove his sling and be properly restrained." Dkt. 52 at 23 (citing Feinberg Decl. ¶ 45). They also argue that Defendant Fellows did not act with deliberate indifference when she informed Plaintiff that "he did not need his sling during the escort and then documented Plaintiff's refusals to attend his scheduled treatments because he refused to be properly restrained during the escort." *Id.* at 23-24.

The Court notes that Defendant George's only involvement in this action is his alleged refusal to transport Plaintiff to his December 15, 2014 appointment. And it seems that Plaintiff's related allegation against Defendant Fellows involves her refusal to allow Plaintiff to be transported to that appointment and her alleged fabricated accusations that Plaintiff's actions were

deemed a medical refusal. However, the record shows that the appointment was not related to Plaintiff's need for a dressing change, but instead it was for routine blood work. *See* Dkt. 63 at 36; Feinberg Decl. ¶ 43; Ex. B at Shaw 047. Even if Defendants George's and Fellows's actions specifically caused Plaintiff some harm, no reasonable trier of fact could conclude that these Defendants purposefully acted with deliberate indifference to Plaintiff's serious medical needs. Plaintiff's allegations amount at most to negligence. Again, as mentioned above, negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835.

### 3) Claims Relating to Defendant Thomas's Discontinuation of Plaintiff's Arm Sling and Spica Splint

Plaintiff claims that Defendant Thomas's "discontinuation of [his] arm sling and spica splint were not medically justifiable and there is evidence that [he] suffered additional injury as a result of their discontinuations." Pl. Decl. ¶ 63. Plaintiff argues that Defendant Thomas's decision to discontinue the arm sling was not "because the defendant sincerely believed Plaintiff no longer needed it for medical reasons, but to appease custodial edict." Dkt. 1 at 11. He also claims that Defendant Thomas's order to discontinue his spica splint "one month ahead of the recommended date" was "based on Plaintiff's race." *Id.* at 12.

Defendants argue that "Plaintiff's arm sling was not medically necessary, and there is no medical evidence to suggest [Defendant] Thomas's decision to remove the spica splint was medically inappropriate, deliberately indifferent, or caused Plaintiff any further injury." Dkt. 52 at 23 (citing Feinberg Decl. ¶¶ 46, 54). As mentioned above, Defendants point out that the chrono issued by Defendant Ikegbu also indicated the Plaintiff needed to have "an increased cuffing distance between his hands and behind his back," which means that she did not intend for Plaintiff to wear the arm sling at all times." *Id.* at 23 (citing Feinberg Decl. ¶ 44; Ex. B at Shaw 050). Furthermore, Defendants argue that under section 3354 of Title 15 of the California Code of Regulations, inmates may not demand particular medication, diagnostic evaluation, or course of treatment. *Id.* at 24. Section 3354 specifically states, "Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care

consultants shall be permitted within the scope of their licensures, to diagnose illness or prescribe medication and health care treatment for inmates. No other personnel or inmate may do so." Cal. Code Regs., tit. 15 § 3354(a). Thus, Defendant contend that "[w]ithout evidence to show the discontinuation of the sling or the splint were medically inappropriate, Defendants could not have been deliberately indifferent to Plaintiff's care." Dkt. 52 at 24. Finally, Defendants point out that "[o]ne of the primary purposes of follow-up visits is for a clinician to reassess a patient's current condition and make adjustments to the treatment plan accordingly," *see* Feinberg Decl. ¶ 46, and they claim that is "precisely what Defendant Thomas did when she discontinued the arm sling on December 16 and spica splint on December 30, 2014." *Id.*, Feinberg Decl. ¶¶ 46, 52.

Plaintiff has not established a triable issue of fact that Defendant Thomas was deliberately indifferent to Plaintiff's thumb injury when she discontinued the arm sling and spica splint. According to Defendant Thomas's physician's progress notes dated December 16, 2014, Plaintiff's "7410 [chrono] [was] updated to discontinue the [arm] sling" because "[t]his is not indicated for a thumb fx [fracture]." Feinberg Decl. ¶ 46, Ex. B at Shaw 055. The Court notes that a few weeks later, Defendant Thomas drafted physician's progress notes dated December 30, 2014, which indicated that there was no medical need for the spica splint, stating as follows:

> No [inmate] encounter. [Plaintiff] has his last dressing change to right thumb s/p [status post] compound fx [fracture] scheduled for 12/30/14. Per the RN wound is closed & healing well. I was in the same exam room today during the dressing change. Pt [patient] denied any pain. Will dc [discontinue] the dressing changes completely. Remove the Thumb spica and order ACE wrap only to support the thumb. RN can show pt [patient] how to wrap. He has repeat xray ordered and pending.

Feinberg Decl. ¶ 52, Ex. B at Shaw 073. While Plaintiff argues that his spica splint was discarded on January 9, 2015 when his repeat x-rays of his thumb were taken. Pl. Decl. ¶ 43. Plaintiff argues the "decision to prematurely remove [his] spica splint evinces a blatant showing of deliberate indifference to [his] medical needs and treatment pla[]n." Dkt. 1 at 12.

Plaintiff's personal disagreement with the Defendant Thomas's decisions to discontinue the arm sling and spica splint is insufficient to establish deliberate indifference for an Eighth Amendment claim. Plaintiff's subjective belief—that the discontinuation of the arm sling was at

the request of custody staff or that the discontinuation of the spica splint was based on his race—does not prove that Defendant Thomas acted with deliberate indifference. Plaintiff has not met his burden of providing evidence from which a reasonable jury could conclude that "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [his] health." *See Toguchi*, 391 F.3d at 1058-60. Plaintiff has not provided any evidence that all thumb injuries require the use of arm slings or spica splints for periods longer that he was allowed. He has not indicated that he has any medical training or that he is competent to speak to the proper care for an injured thumb. And even if Plaintiff could have provided the necessary evidence to show the need for the arm sling and spica splint, any claims of their premature discontinuation would amount only to negligence in providing treatment and does not support a claim of deliberate indifference. *See Farmer*, 511 U.S. at 835. Therefore, the Court finds that no reasonable trier of fact could conclude that Defendant Thomas purposefully acted with deliberate indifference to Plaintiff's serious medical needs when he discontinued the arm sling and spica splint.

### 4) Claim Relating to Denial of Medical Care by Defendant Thomas on February 24, 2015

Plaintiff claims that Defendant Thomas denied him medical care on February 24, 2015 when she ended the appointment abruptly and prevented him from "receiv[ing] adequate instructions on how to care for his fractured thumb." Dkt. 1 at 26. Plaintiff adds that Defendant Thomas's "assertion that [Plaintiff] was uncooperative, argumentative and loud during [the February 24, 2015] follow-up visit was a mere pretext to cover up the fact that she never intended to make sure Plaintiff received" the necessary instructions. *Id.* As mentioned above, Plaintiff also originally argued that Defendant Thomas "discontinued [Plaintiff's] health care appointment prematurely in retaliation for the submission of Appeal [log no.] [PBSP] HC 15028879." Dkt. 1 at 14. However, the Court need not further address Plaintiff's retaliation claim because it has been found to be unexhausted above.

Defendants argue that, contrary to Plaintiff's allegation, "the facts show that [Defendant] Thomas detailed her medical evaluation of Plaintiff, and she ordered additional treatment,

including two physical-therapy evaluations, and advised Plaintiff to continue active range of motion exercises." Dkt. 52 at 27 (citing Feinberg Decl. ¶ 62, Ex. B at Shaw 092-094).

The Court finds that Plaintiff's self-serving and conclusory statements may be disregarded if not supported by any other evidence. *See Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."). And conclusory allegations are insufficient to defeat summary judgment. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Furthermore, Plaintiff has not established a triable issue of fact that Defendant Thomas acted with deliberately indifference during the February 24, 2015 appointment. As mentioned above, Plaintiff argues that Defendant Thomas failed to give him adequate instructions on how to care for his fractured thumb. Dkt. 1 at 26. However, the record contradicts this because according to Defendant Thomas's physician's progress notes dated February 24, 2015, she did the following:

(1) she read aloud Dr. Cross's February 11, 2015 notes to Plaintiff explaining that repeat x-rays were ordered and physical therapy sessions were recommended until Dr. Cross reviewed the x-rays (Dkt. 52-6 at 123);

(2) she explained to Plaintiff that Dr. Cross reviewed the x-rays on February 19, 2015 and wrote a report, stating in part as follows:

> There is evidence of healing of fracture in this middle phalanx at the IP [interphalangeal] joint. There is no change in alignment or position and in my opinion looks like this is going to go on to healing with an acceptable alignment that cannot be improved with surgical intervention. He is to continue active range of motion with a repeat x-ray in approximately one month. (*Id.* at 122-23);

(3) she advised Plaintiff to "continue active ROM [range of motion]" (*Id.* at 124); and

(4) she requested two "PT [physical therapy] visits" (*Id.*).

Thus, Plaintiff cannot create a triable issue of fact by simply misrepresenting what took place during a medical examination, as the Court need not credit a party's version of the facts that is "blatantly contradicted by the record." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment.").

Plaintiff cannot establish a triable issue of material fact that Defendant Thomas's actions or plan of treatment did not advance a legitimate medical goal. Instead, as seen in the aforementioned summary of Defendant Thomas's progress notes from Plaintiff's February 24, 2015 appointment, Defendant Thomas was working to address Plaintiff's medical issue by relaying the latest findings by Dr. Cross pertaining to Plaintiff's thumb and ordering the two physical therapy appointments. Therefore, Plaintiff has failed to provide evidence regarding an essential element of his Eighth Amendment claim against Defendant Thomas relating to and alleged denial of medical care during the February 24, 2015 appointment.

### 5) Claims Relating to the Denial of Physical Therapy Sessions, Further Specialty Evaluations, or Reconstructive Surgery on His Thumb

Plaintiff claims that Defendants acted with deliberate indifference to his medical needs because he claims they denied him more physical therapy sessions (in addition to the two that were ordered), further specialty evaluations, and reconstructive surgery on his thumb. Pl. Decl. ¶ 63.

Defendants argue that the undisputed admissible evidence shows "it was not medically necessary for Plaintiff to obtain further specialty evaluations, reconstructive surgery on his thumb, or hundreds of hours of physical therapy because his thumb injury had healed with an appropriate and acceptable alignment." Dkt. 52 at 22. Specifically, Defendants argue that the medical care provided to Plaintiff included "four x-rays of [his] thumb (Feinberg Decl. ¶¶ 11, 15, 27, 30), three orthopedic specialist consults and assessments (*Id.* ¶¶ 30, 31, 39), and two physical therapy visits (*Id.* ¶ 32). *Id.* at 24. Thus, Defendants contend that "[c]ontrary to Plaintiff's assertions, the undisputed medical records show that none of the medical professionals have ever recommended 'hundreds of hours of intense physical therapy.'" *Id.* Defendants argue that their prescriptions, wound care, and treatments were proper and necessary to allow Plaintiff's thumb to heal with an appropriate and acceptable alignment that could not be improved with surgical intervention. Dkt. 52 at 25 (citing Feinberg Decl. ¶ 68). Thus, in response to any need for more physical therapy, further specialty evaluations, and reconstructive surgery, Defendants contend that Plaintiff's

United States District Court
Northern District of California

"disagreement with [their] medical decisions," which "is nothing more than a difference of opinion and does not amount to a constitutional violation." *Id.* (citing *Franklin*, 662 F.2d at 1344).

The Court finds that Plaintiff's subjective belief that it was "medically necessary" to grant his requests for more physical therapy sessions, further specialty evaluations, and reconstructive surgery on his thumb, *see* Pl. Decl. ¶ 63, does not prove that Defendants acted with deliberate indifference. Again, Plaintiff has not met his burden of providing evidence from which a reasonable jury could conclude that the treatment Defendants provided him was "medically unacceptable under the circumstances," or that they chose this course in "conscious disregard of an excessive risk" to Plaintiff's health. *See Toguchi*, 391 F.3d at 1058-60. For example, Plaintiff has not provided any evidence that all thumb injuries similar to his require extensive physical therapy sessions, further specialty evaluations, and reconstructive surgery. As mentioned above, he has not indicated that he has any medical training to make such a recommendation. Instead, the record shows no medical necessity for Plaintiff to obtain further specialty evaluations or reconstructive surgery on his thumb because the radiologists and Dr. Cross (the orthopedic specialist) concluded that Plaintiff's x-rays indicated that his thumb injury had healed with an appropriate and acceptable alignment. *See* Feinberg Decl., Ex. B at Shaw 089-091. As to Plaintiff's alleged need for "over one hundred hours of intense physical therapy sessions," Dkt. 1 at 15, he only bases such an allegation on "information and belief," which is insufficient to raise an issue of material fact. *See Taylor v. List*, 880 F.2d 1040, 1045 n.3 (9th Cir. 1989) (To raise an issue of material fact, a statement must be made on personal knowledge, not on information and belief.). Therefore, the Court finds that no reasonable trier of fact could conclude that Defendants purposefully acted with deliberate indifference to Plaintiff's serious medical needs when they denied his requests for more physical therapy sessions, further specialty evaluations, and reconstructive surgery on his thumb.

### 6) Claims Against Defendants Jacobsen and McLean

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is no genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference

against Defendants Jacobsen[16] and McLean based on their individual actions. These Defendants involvement with Plaintiff's medical care was in reviewing two of Plaintiff's health care appeals (log nos. PBSP HC 14028835 and PBPS HC 15028879) at the first level of review (Defendants Jacobsen) and at the second level of review (Defendant McLean). *See* Feinberg Decl. ¶¶ 54-56; McLean Decl. ¶ 4. As mentioned above, Defendant Jacobsen partially granted and partially denied Plaintiff's first health care appeal (log no. PBSP HC 14028835) on January 30, 2015, noting that it was granted as to his request that the appeals process be completed without delay and denied as to his request for custody staff to honor the chrono that he wear his arm sling when being escorted in waist chains. McLean Decl, Ex. B. Specifically, Defendant Jacobsen explained that the chrono was only for the temporary use of an arm sling, and medical staff could only recommend physical/movement limitations—the use of waist chains was a custody decision. *See id.* Defendant McLean partially denied Plaintiff's first health care at the second level of review on March 9, 2015. *Id.*

On February 12, 2015, Defendant Jacobsen partially granted Plaintiff's second appeal (PBPS HC 15028879) because the IUMC had approved a follow-up TeleMedicine Orthopedic visit, which was completed on February 11, 2015. McLean Decl., Ex. C. Defendant Jacobsen partially denied the appeal as to all other requests were denied upon noting, in part, that reconstructive surgery was not recommended by the orthopedic visit and that there was nothing medically inappropriate about the discontinuation of the sling or the splint. *Id.* On April 9, 2015, McLean partially granted Plaintiff's second appeal as to the request that his grievance be processed without delay and denied it as to all other requests. *Id.*

The record shows that Defendants Jacobsen and McLean did not provide Plaintiff with medical care and had no authority to provide him with appliances or accommodations that had been determined medically unnecessary by Plaintiff's Primary Care Provider. McLean Decl. ¶ 3,

---

[16] Defendant Jacobsen was also a member of the IUMC which reviewed requests for services related to Plaintiff's thumb injury. *See* Feinberg Decl., Ex. B at Shaw 101-106. Defendant Jacobsen's involvement in the IUMC decisions will be discussed separately below. *See infra* Part III.C. "Claims Against Members of IUMC."

Exs. B, C; Feinberg Decl. ¶ 55. Defendant McLean's meaningful assessment of Plaintiff's treatment included a report on Dr. Cross's x-ray comparisons—noting evidence of healing of the fractured thumb joint, no change in alignment or position, and finding Plaintiff's thumb was going to heal with an acceptable alignment that did not required surgical intervention. *Id.*

None of the aforementioned actions by Defendants Jacobsen and McLean would lead a reasonable jury to find deliberate indifference to Plaintiff's medical needs. In opposition, Plaintiff has failed to identify with reasonable particularity the evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Therefore, Defendants Jacobsen and McLean are entitled to summary judgment on the deliberate indifference claim against them based on their involvement in the aforementioned grievance process.

### 7) Claims Related to the IUMC

As mentioned above, during the relevant time frame—December 2014 through April 2015—the IUMC met three times relating to Plaintiff's medical care: on December 16, 2014, January 21, 2015, and March 4, 2015. Feinberg Decl. ¶ 66. The members of the IUMC were Defendants Risenhoover, Adam, Jacobsen, Ikegbu, Sayre, and Venes. *Id.* The record shows that Defendant Alpaugh documented the IUMC meetings and recommendations. *Id.* Plaintiff claims that the "actions and conduct of [the aforementioned Defendants] demonstrate deliberate indifference . . . ." Dkt. 1 at 23-24.

First, Plaintiff's aforementioned conclusory allegation against Defendant Alpaugh is that her actions "demonstrate deliberate indifference." *Id.* However, the record indicates that this Defendant did not take part in any decisions making process and instead documented the IUMC meetings and recommendations. Feinberg Decl. ¶ 66. Plaintiff does not dispute this fact, and he makes no specific allegations against Defendant Alpaugh. Accordingly, it cannot be said that Defendant Alpaugh acted with deliberate indifference to Plaintiff's medical needs when she documented the IUMC meetings and recommendations.

Even if Defendant Alpaugh took part in the decision-making process and could be sued in the same capacity as the other aforementioned Defendants (based on their participation in the IUMC which reviewed the requests for services for Plaintiff's medical care), Defendants argue

United States District Court
Northern District of California

that such a claim is without merit. Dkt. 52 at 24-25. Defendants point out that the undisputed

facts show that the members of the IUMC review policy guidelines and discuss requests for

specialty services. *Id.* at 24. They argue that the record shows that during each of the three

relevant IUMC meetings, Plaintiff's treatments were evaluated and approved by the members of

the committee. *Id.* (citing Feinberg Decl. ¶ 67, Ex. B at Shaw 101-106). Defendants contend that

no evidence exists showing that the IUMC denied Plaintiff care or treatment. *Id.* at 24-25.

Instead, as mentioned above, Defendants argue that their prescriptions, wound care, and treatments

were proper and necessary to allow Plaintiff's thumb to heal with an appropriate and acceptable

alignment that could not be improved with surgical intervention. *Id.* (citing Feinberg Decl. ¶ 68).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is no

genuine dispute as to any material fact relating to his claim of deliberate indifference against the

IUMC or any of the specific members named from the three relevant meetings on the December

16, 2014, January 21, 2015, and March 4, 2015. *See* Feinberg Decl., Ex. B at Shaw 101-106.

During the first two meetings on December 16, 2014 and January 21, 2015, the IUMC met to

review Plaintiff's medical records and approved the request of a total of two orthopedic

evaluations of Plaintiff's thumb. *Id.* at Shaw 101-104. At the third IUMC, on March 4, 2015,

after further review of Plaintiff's x-ray, the orthopedic surgeon's determination that Plaintiff was

not a surgical candidate, and noting Plaintiff was uncooperative with his PCP, the committee

approved Defendant Thomas's request for two visits to be evaluated by a physical therapist, who

can teach her correct ROM [range of motion] [and] stretching post-injury." *Id.* at 105-106.

During each of the three IUMC meetings, Plaintiff's treatments were evaluated and approved by

the members of the committee. *Id.* at 101-106. There is no indication that the IUMC was

otherwise aware that Plaintiff was facing a substantial risk of serious harm and disregarded that

risk when they made any of their recommendations. *Id.*; *see Farmer*, 511 U.S. at 837. To the

extent that Plaintiff's claim could be construed to be that Defendants purposefully acted with

deliberate indifference to Plaintiff's serious medical needs when they denied his requests for more

physical therapy sessions by only recommending two during the March 4, 2015 meeting, the Court

has already found that no reasonable trier of fact could conclude that such a decision amounted to

47

deliberate indifference. *See supra* Part II.C.b.5 "Claims Relating to the Denial of Physical Therapy Sessions, Further Specialty Evaluations, or Reconstructive Surgery on His Thumb." Furthermore, even if the IUMC agreed with the opinions and recommendations based on the Sutter Coast Hospital Emergency Room records and the orthopedic surgeon's evaluation (at the December 16, 2014) or those of Defendant Thomas (at the January 21, 2015 and March 4, 2015 meetings), it does not establish deliberate indifference because a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058.

Therefore, Defendants Risenhoover, Adam, Jacobsen, Ikegbu, Sayre, and Venes, and Alpaugh are entitled to summary judgment on the deliberate indifference claim against them based on their participation in the IUMC.

### 8) Summary

Based on the evidence presented, Defendants have shown that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claim against them. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Accordingly, Defendants are entitled to judgment as a matter of law as to Plaintiff's Eighth Amendment claim against them. *Id.*; *Celotex Corp.*, 477 U.S. at 323.

### c. Qualified Immunity Defense

As an alternative basis for summary judgment, Defendants contend that they are entitled to qualified immunity. Dkt. 52 at 28. Because the Court has found above that Plaintiff's retaliation claim is unexhausted, it need not address Defendants' alternative argument that they are entitled to qualified immunity as to that claim. Thus, the Court will only analyze Defendants' alternative basis for summary judgment in relation to Plaintiff's Eighth Amendment claim of deliberate indifference to his serious medical needs.

"Qualified immunity shields an officer from suit when she makes a decision that, even if

constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The issue of qualified immunity generally entails a two-step process, which requires the court to determine first whether the defendant violated a constitutional right, and then to determine whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court modified the *Saucier* test and "gave courts discretion to grant qualified immunity on the basis of the 'clearly established' prong alone, without deciding in the first instance whether any right had been violated." *James v. Rowlands,* 606 F.3d 646, 650-51 (9th Cir. 2010) (discussing *Saucier* standard after *Pearson*). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202; *see, e.g.*, *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049-50 (9th Cir. 2002) (court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law). In the instant case, the Court has concluded that Plaintiff's constitutional rights were not violated. Thus, viewing the record in the light most favorable to Plaintiff, Defendants prevail as a matter of law on their qualified immunity defense because the record establishes no Eighth Amendment violation. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, even if a constitutional violation occurred, these Defendants also remain entitled to qualified immunity as to each claim.

While Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established in 2012, because it would not be clear to a reasonable prison health care provider or correctional officer that Plaintiff should have been received any different medical care or treatment to address his thumb, which healed appropriately. Again, differences in medical opinions do not amount to constitutional violations. *See Toguchi v. Chung*, 391 F.3d at 1058, 1059-60. Accordingly, Defendants are entitled, as an alternative matter, to qualified immunity with respect to Plaintiff's aforementioned deliberate indifference claim.

### d.  Request for Declaratory or Injunctive Relief

In his relief requested section, Plaintiff requests: (1) for injunctive relief to have his thumb examined by a qualified physician; (2) to receive extensive physical therapy or "other follow-up medical treatment to be evaluated by a medical practitioner with expertise in the treatment and restoration of function of the interphalangeal [thumb] joint, and (3) to "carry out without delay the treatment directed by such medical practitioner."  Dkt. 1 at 28.

Defendants argue Plaintiff's request is barred by a pending class action, *Plata v. Schwarzenegger*, No. C-01-1351-THE (N.D. Cal., filed April 5, 2001).  *See* Dkt. 52 at 29-30.  In *Plata*, by stipulation filed June 13, 2002 and order dated the same date, the class therein was defined as "consist[ing] of all prisoners in the custody of the CDC with serious medical needs, except those incarcerated at [PBSP]."  *See* Dkt. 68 at 5 in Case No. C 01-01351 TEH (N.D. Cal. June 13, 2002) (Stipulation and Order for Injunctive Relief).[17]  However, the parties in *Plata* stipulated that prisoners at PBSP would be included within the *Plata* class, by stipulation filed June 6, 2008 and order dated the same date.  *See* Dkt. 1228 at 1 and Dkt. 1237 at 1 in Case No. C-01-01351 TEH (N.D. Cal. June 6, 2008) (Stipulation and Order Re Merger of Medical Health Care at Pelican Bay State Prison).[18]

Separate individual suits may not be maintained for equitable relief from alleged unconstitutional prison conditions where a class action lawsuit involving the same subject matter is pending.  *See Crawford v. Bell*, 599 F.2d 890, 892-93 (9th Cir. 1979); *McNeil v. Guthrie*, 945 F.2d 1163, 1165-66 (10th Cir. 1991); *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) (en banc).  "Individual members of the class and other prisoners may assert any equitable or declaratory claims they have, but they must do so by urging further action through the class representative and attorney, including contempt proceedings, or by intervention in the class action."  *Gillespie*, 858 F.2d at 1103.  Because Plaintiff's request for injunctive relief falls within the subject matter of *Plata*, specifically, adequacy of medical care, it may not be maintained in the

---

[17] A court may take judicial notice of public records.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

[18] *See supra* footnote 17.

instant action.   Accordingly, Plaintiff's request for a preliminary injunction is DENIED.[19]

**IV.     CONCLUSION**

For the reasons outlined above, the Court orders as follows:

1.     Plaintiff's request for a continuance in order to oppose summary judgment under Rule 56(d) is DENIED.  Dkt. 61.

2.     Defendants' motion for summary judgment is GRANTED as to all claims, and judgment will be entered in their favor.  Dkt. 52.  Specifically, Defendants' motion for summary judgment is GRANTED on the merits of Plaintiff's Eighth Amendment claim.  And Defendants' motion for summary judgment is also GRANTED based on Plaintiff's failure to exhaust administrative remedies as to his retaliation claim against Defendant Thomas.  Thus, his retaliation claim is DISMISSED without prejudice to refiling after exhausting California's prison administrative process.  *See McKinney*, 311 F.3d at 1200-01.

3.     The Clerk shall enter judgment, close the file, and terminate as moot any remaining pending motions.

4.     This Order terminates Docket Nos. 52 and 61.

IT IS SO ORDERED.

Dated:   January 10, 2019

_____
YVONNE GONZALEZ ROGERS
United States District Judge

---

[19] The Court's determination that Plaintiff's requests for injunctive relief is barred by the pending class action in *Plata* obviates the need for the Court to address Defendants' alternative argument that such a request should be denied substantively.  *See* Dkt. 52 at 29.